IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**SALINE PARENTS**,
an unincorporated association,
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**RAELYN DAVIS**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**XI VAN FLEET**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**JOSEPH CAREY MOBLEY**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**MICHAEL RIVERA**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

**SHAWNTEL COOPER**
c/o American Freedom Law Center
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001

Plaintiffs,

v.

**MERRICK GARLAND**,
in his official capacity as Attorney General of the United States of America
Department of Justice
10th & Pennsylvania Avenue, NW
Washington, D.C. 20530

Defendant.

**COMPLAINT**

[Declaratory and Injunctive Relief]

Plaintiffs Saline Parents, Raelyn Davis, Xi Van Fleet, Joseph Carey Mobley, Michael Rivera, and Shawntel Cooper (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against the above-named Defendant, his employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

## INTRODUCTION

1. This is a civil action in which Plaintiffs seek to protect their fundamental rights to freedom of speech, to direct the education of their children, and to be free from unlawful discrimination based upon their political and religious beliefs and views.

2. Plaintiffs seek a preliminary and permanent injunction enjoining the recently announced policy of the Attorney General ("AG Policy") to use federal law enforcement resources to silence parents and other private citizens who publicly object to and oppose the divisive, harmful, immoral, and racist policies of the "progressive" Left that are being implemented by school boards and school officials in public school districts throughout the United States, including in the public schools in Saline, Michigan, and in Loudoun County, Virginia.

## JURISDICTION AND VENUE

3. This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1346.

4. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

5. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because the office of the Attorney General of the United States is located in this district and a substantial part of the acts giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

6. Plaintiff Saline Parents is an unincorporated association of parents with children in the Saline Area Schools ("SAS"), which is the public school district for Saline, Michigan, and of concerned private citizens who pay taxes to support SAS.

7. Plaintiff Saline Parents and its members, including Plaintiff Raelyn Davis, are concerned about and oppose the divisive, false, harmful, immoral, and racist curricula and policies adopted and implemented by the school board for SAS.

8. Plaintiff Saline Parents and its members associate for the purpose of expressing their opposition to the divisive, false, harmful, immoral, and racist curricula and policies adopted and implemented by SAS.

9. Plaintiff Saline Parents and its members, including Plaintiff Davis, make their opposition known publicly, including at public school board meetings and in other public forums.

10. Plaintiff Raelyn Davis is a resident of Saline, Michigan, and she is a concerned parent of children in SAS. She is the mother of ten children. Plaintiff Davis currently has two children attending Saline High School. She also has children in the first, third, fifth, and seventh grades, all of whom are homeschooled because of the school district's "progressive" policies and curricula outlined in this Complaint. All of these children were, at one time, enrolled in SAS. While not enrolled as students, the fifth and seventh grade students currently participate in the school band. Plaintiff Davis's two preschool children (ages 3 and 5) have never been enrolled in

SAS, and unless SAS changes its divisive, false, harmful, immoral, and racists policies and curricula outlined in this Complaint, she may never enroll any of them.

11. Plaintiff Davis is the director and a member of Saline Parents, and she has publicly opposed at school board meetings and elsewhere the divisive, false, harmful, immoral, and racist curricula and policies adopted and implemented by SAS as set forth in this Complaint. Plaintiff Davis is also responsible for maintaining the content of the Saline Parents website, SalineParents.org.

12. As a resident of Saline, Michigan, Plaintiff Davis pays taxes that support SAS.

13. Plaintiffs Saline Parents and Davis strongly and publicly object to and oppose the divisive, false, harmful, immoral, and racist curricula and policies proposed and/or adopted and implemented by the school board for SAS, specifically including, but not limited to, the school board's transgender policy, its pornographic sexual education curricula, and its Critical Race Theory ("CRT") indoctrination and training, which trains children to be racist. These curricula and policies are largely favored by "progressives" on the Left, and they are opposed by Plaintiffs Saline Parents and Davis and other parents and citizens in Saline, Michigan, whose tax dollars are used to fund SAS.

14. Plaintiff Xi Van Fleet is a resident of Loudoun County, Virginia. She had a child that graduated from the Loudoun County Public Schools ("LCPS"). She is a taxpayer, and her taxes support LCPS.

15. Plaintiff Van Fleet endured Mao's Cultural Revolution before immigrating to the United States. Based on her experience, the Attorney General of the United States is using tactics similar to ones she saw Communist China use to stop parents from speaking out.

16. When she was in China, Plaintiff Van Fleet spent her entire school years in the Chinese Cultural Revolution, so she is very familiar with the communist tactics used to divide people, to cancel the Chinese traditional culture, and to destroy its heritage. Based on her observations, all of this is happening here in the United States, and the Attorney General is providing the enforcement mechanism to stifle opposition to it.

17. Plaintiff Van Fleet is an outspoken, public critic of LCPS and its promotion of the CRT ideology. She has been called a racist for her opposition to this ideology, and now she is being labeled a domestic terrorist for her opposition.

18. Plaintiff Joseph Carey Mobley is an African-American, a veteran, a parent of school-age children, and a resident of Loudoun County, Virginia. He is a taxpayer, and his taxes support LCPS.

19. Plaintiff Mobley is an outspoken, public critic of LCPS and its promotion of the CRT ideology and its adoption of the transgender policy. Plaintiff Mobley opposes all forms of racism, including the racism promoted by the CRT ideology, and he opposes the transgender policy as it is divisive, false, harmful, and immoral.

20. Plaintiff Michael Rivera is a parent of school-age children who attend LCPS. He is a resident of Loudoun County, Virginia, and a taxpayer. Plaintiff Rivera's taxes support LCPS.

21. Plaintiff Rivera is an outspoken, public critic of LCPS and its promotion of the CRT ideology and its adoption of the transgender policy. Plaintiff Rivera opposes all forms of racism, including the racism promoted by the CRT ideology, and he opposes the transgender policy as it is divisive, false, harmful, and immoral.

22. Plaintiff Shawntel Cooper is an African-American, and a parent of school-age children in LCPS. More specifically, Plaintiff Cooper has two children. She pulled her youngest

child out of LCPS in 2021 due to LCPS's unsafe policies as set forth in this Complaint. Her older child (who is 17 years old) remains in LCPS. Plaintiff Cooper is a resident of Loudoun County, Virginia, and a taxpayer. Her taxes support LCPS.

23. Plaintiff Cooper is an outspoken, public critic of LCPS and its promotion of the CRT ideology and its adoption of the transgender policy. Plaintiff Cooper opposes all forms of racism, including the racism promoted by the CRT ideology, and she opposes the transgender policy as it is divisive, false, harmful, and immoral.

24. A true and correct video of Plaintiff Cooper passionately addressing the LCPS school board in opposition to its adoption of the racist CRT ideology can be found here: https://www.youtube.com/watch?v=kf_rc_YKJP0.

25. Defendant Merrick Garland is the Attorney General of the United States ("Attorney General"). In his official capacity as Attorney General, Defendant Garland is the chief law enforcement officer of the United States, and he has the authority and power to dedicate federal law enforcement resources, including those of the Federal Bureau of Investigation ("FBI"), to enforce the policies and practices of the Attorney General and the Department of Justice, including the AG Policy challenged here.

## FACTUAL ALLEGATIONS

26. America's public schools are failing because "progressive" school officials are more concerned with promoting a particular agenda than properly educating the children under their charge.

27. Many parents and legal guardians do not have the capacity or resources to educate their children at home or at a private school and are thus compelled to send their children to public school.

28. Plaintiffs believe, and it is the law in many states, including Michigan and Virginia, as well as a fundamental right under the United States Constitution, that it is the natural, fundamental right of parents and legal guardians to determine and direct the care, teaching, and education of their children. As parents and concerned citizens, Plaintiffs have a right to publicly object to the divisive, false, harmful, and immoral curricula and policies being advanced by SAS and LCPS. This right to publicly criticize SAS and LCPS includes the right to do so vociferously and even stridently.

29. Progressives, such as the Attorney General, do not believe that it is a parent's right to determine and direct the care, teaching, and education of his or her children. The Democratic Party candidate for the Governor of Virginia, Terry McAuliffe, who adheres to the "progressive" ideology shared by the Attorney General, stated publicly during a recent gubernatorial debate that which "progressives" privately believe: "[They] don't think parents should be telling schools what they should teach."

30. Parents and private citizens who fund our public schools through their hard-earned tax dollars, including Plaintiffs, are rightly outraged by the notion that parents must surrender their children, under compulsion of law, to school officials who are bent on indoctrinating these young students with false, divisive, harmful, immoral, and racist dogma and ideology.

31. America's public schools, including SAS and LCPS, are funded by tax dollars from those who live in their respective school districts, including Plaintiffs.

32. Just because parents and legal guardians are forced to send their children to public school, this does not mean that they surrender their rights as parents to direct the education of their children, particularly as it relates to religious, moral, and political issues.

33. Unfortunately, many public schools, including those in SAS and in LCPS, have come under the influence and power of "progressives" who are using these publicly-funded schools to promote the divisive, false, harmful, immoral, and racist agenda of the "progressive" Left. Rather than focusing on core subjects such as reading, writing, arithmetic, and science, these schools are using their power of compulsion to indoctrinate children with a divisive, false, harmful, immoral, and racist agenda.

34. SAS has hired a "cultural responsive consultant" and is promoting what it calls Culturally Responsive Instruction ("CRI").

35. SAS permits the display of a Black Lives Matter ("BLM") flag in its school. BLM is a racist and Marxist organization. Saline Parents have publicly objected to the display of this flag in SAS, but the flag remains.

36. Some schools refer to the K-12 CRT program as Diversity, Equity, and Inclusivity ("DEI"), arguing that CRT is a university-level program and thus different from CRI or DEI or some other "equity" or "diversity" curricula or training.

37. In the name of "dismantling systemic racism," LCPS has implemented explicit racial distinctions between its students. The official LCPS Action Plan to Combat Systemic Racism creates a new position of Student Equity Ambassador ("SEA"), which is limited to certain students on account of their race, and discriminates against students on the basis of their viewpoint. LCPS has also implemented a viewpoint discriminatory "bias reporting system" that chills students' speech on matters of important public concern.

38. SAS's and LCPS's policies and curricula promote the false and divisive narrative of the "progressive" Left that America, its institutions, its culture, its traditions, and its language

are all based on systemic racism. As a result, these policies and curricula teach students to view America as systemically racist.

39. Due to the highly politicized, public, and controversial nature of CRT, many public schools, including SAS and LCPS, have sought to disguise the CRT agenda they are promoting by claiming that it is CRI, DEI, or some other term designed to distance the program from CRT. In terms of their objectives and effects, CRT, CRI, and DEI, as well as similar "equity" and "diversity" programs, are indistinguishable. They all reject Martin Luther King's admonition to judge a person by the content of their character and not by the color of their skin—an admonition that Plaintiffs support. The effect of these programs (CRT, CRI, DEI, and others) is the promotion of racism in the public schools. These programs teach students to become racists.

40. SAS and LCPS are also promoting transgender policies, which advance the false assertion that gender is a fluid concept and not determined biologically at birth. This assertion is contrary to science (biology), and it is contrary to God's creation as expressly set forth in Genesis, where God made man and woman, and it was "good."

41. SAS is promoting a sex education program that is immoral and pornographic.

42. SAS's sex education program uses graphic "stick figure porn" to teach young students, including seventh grade students, about sex. It teaches these young students about different kinds of sexual positions and acts. And it teaches these young students how to masturbate and clean up after sex. A sample of the "stick figure" pornography and other graphic and objectionable images/lessons of this program appear below:



How do we define sex?

- Body parts that help make us male or female
- Oral, anal, or vaginal contact between two people

What is sexual intercourse?

- Vaginal (penis into vagina)
- Oral (mouth on penis or mouth on vagina)
- Anal (penis into anus)

43. Parents and concerned citizens, including Plaintiffs, rightfully object to the implementation of such divisive, false, harmful, immoral, and racist policies and programs in their public schools. And these parents and citizens, including Plaintiffs, rightfully express their outrage and objections to these programs during school board meetings—meetings which are open to the public and open for public comment—and in other public forums. Indeed, school board meetings are public forums where speech touching upon matters of public concern is fully protected by the First Amendment.

44. Contrary to the Attorney General's false assertion, there is no widespread criminality at school board meetings where parents and concerned citizens have expressed their opposition and outrage to the "progressive" agenda being forced upon their children in the public schools. There is no widespread threat of criminal violence at these meetings. Instead, these

meetings involve private citizens expressing their opposition to harmful policies being considered by government officials. These meetings involve private citizens petitioning their government officials for a redress of grievances, as is their right to do under the First Amendment. Yet, the Attorney General considers these private citizens engaging in constitutionally protected activity to be domestic terrorists. Accordingly, the Attorney General labels these private citizens, which includes Plaintiffs, as domestic terrorists.

45. In furtherance of his policy to silence opposition to the "progressive" agenda at school board meetings across the country, the Attorney General announced a policy on or about October 4, 2021, that was intentionally designed (its intended purpose and effect) to chill parents and other private citizens, including Plaintiffs, from publicly expressing their opposition to the "progressive" agenda being implemented by government officials in the public schools and thereby silence such expression.

46. In his October 4, 2021, "Memorandum For" Director, Federal Bureau of Investigation; Director, Executive Office for U.S. Attorneys; Assistant Attorney General, Criminal Division; and United States Attorneys (all responsible for investigating and prosecuting criminal activity), the Attorney General falsely states that "there has been a disturbing spike in harassment, intimidation and threats of violence against school administrators, board members, teachers, and staff who participate in the vital work of running our nation's public schools." In his memorandum, the Attorney General gives a meaningless nod to the Constitution, stating, "While spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views." Yet, the AG Policy is, in fact, a heavy-handed, direct threat by a powerful government agency designed and intended "to intimidate individuals based on their views."

47. The AG Policy states that the Department of Justice "is committed to using its authority and resources to discourage these threats . . . and other forms of intimidation and harassment."  The AG Policy creates a "snitch line," by "open[ing] dedicated lines of communication for threat reporting, assessment, and response."  In short, the AG Policy is a direct threat and warning to parents and private citizens across the United States, including Plaintiffs, that the Department of Justice and its FBI will be investigating you and monitoring what you say at these school board meetings so be careful about what you say and how you say it, thereby chilling such expression.

48. The October 4, 2021, memorandum is a one-page screed that rubber-stamps the claims of "progressive," left-wing activists.  It fails to address the Department of Justice's lack of jurisdiction to intrude on interactions between parents and local school boards in the absence of any federal crime, and it fails to account for the fact that the First Amendment protects political dissent—even dissent that rises to the level of intimidation or harassment.

49. The government is without authority to criminalize First Amendment activity that might cause another to feel "harassed" or "intimidated" (even if that is what the speaker intended by his or her First Amendment activity) absent a showing that the speech activity itself falls within one of the very narrow, recognized exceptions, such as making a "true threat" or engaging in "fighting words" or "incitement."  Thus, private speech is afforded great protection.  The Supreme Court has long recognized that even policies aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment.  First Amendment freedoms, such as those possessed by the objecting parents and private citizens, including Plaintiffs, are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference.  Accordingly, government action, such as the AG Policy, which may

have the *effect* of curtailing the freedom of speech is subject to the closest scrutiny under the U.S. Constitution.

50. Members of the school board for SAS have publicly complained that parents who object to SAS policies are "attacking the board" by calling into question the board's integrity and morals.

51. Recently, upset parents admonished LCPS at a public meeting for covering up the rape of a ninth-grade female student by a trans student wearing a skirt in the girl's bathroom. This followed an explosive media report which made public the fact that the girl was raped by a male trans student that identifies as female. LCPS covered up this sexual assault because it undermined its transgender policy as this assault is direct evidence supporting the concerns of parents who opposed this harmful and immoral policy.

52. The father of the female student who was raped was arrested for confronting the LCPS superintendent at a school board meeting held on about June 22, 2021, where CRT and the transgender policy, which grants bathroom "rights" allowing biological males to use female bathrooms, were on the agenda.

53. The father of the assault victim alleges that the LCPS superintendent covered up the rape and was told to keep quiet if he wanted justice for his daughter.

54. The National School Boards Association ("NSBA"), on which the Attorney General relied in issuing the AG Policy, considers the actions of this concerned father, and the actions of other concerned and outraged parents who express their opposition to the "progressive" curricula and polices at school board meetings, to be acts of domestic terrorism. Thus, the concerned (and rightfully angry) father of a girl raped by a trans student in a girl's bathroom in a

public school confronting the superintendent of the school about this crime is a domestic terrorist according to the NSBA and the Attorney General.

55. The Attorney General and the AG Policy have now given the government's imprimatur to and endorsement of the "domestic terrorists" designation and label for concerned parents and private citizens, including Plaintiffs, who publicly express their opposition and outrage to "progressive" school board curricula and policies being imposed upon their children by government officials in our nation's public schools.

56. Because of the AG Policy, public school boards and school officials know that they can now chill and indeed silence the speech of the opposition by claiming that it is "harassing" or "intimidating," or "threatening." In this respect, the AG Policy empowers a "heckler's veto" on the speech of parents and concerned private citizens, including Plaintiffs, with which government officials disagree.

57. In his memorandum, the Attorney General expressly mentions the FBI as a further tool of intimidation. Conducting investigations and surveillance, which is what the FBI does, on private citizens because of their dissident political views is prohibited by our Constitution. The Supreme Court has repeatedly acknowledged the constitutional infirmities associated with government surveillance and investigations that threaten to dampen the exercise of First Amendment rights. Investigation is a part of lawmaking and the First and Fifth Amendments stand as barriers to state intrusion of privacy. Accordingly, we deal here with the authority of the federal government to investigate people, their ideas, and their activities based on their political and religious views. When the government, state or federal, is prohibited from dealing with a subject, it has no constitutional privilege to investigate it. Thus, the Supreme Court has long recognized

the dangers inherent in investigative activity that threatens to dampen the exercise of First Amendment rights, such as the AG Policy.

58. And while the Attorney General has directed his law enforcement authority and resources to target private citizens speaking out at school board meetings, he has completely ignored a real, existential, and national criminal threat because the perpetrators of this *criminal* activity share the Attorney General's political views. We all witnessed through media reporting and perhaps firsthand the widespread criminality, indeed domestic terrorism, engaged in by Antifa and BLM protestors across the country. We have all witnessed the criminal rioting, looting, destruction of private property, attacks on law enforcement, and other crimes committed during these protests. Yet, the Attorney General remains mute on this national crime problem because these protestors are promoting the "progressive" agenda of the Left—an agenda adhered to by the Attorney General.

59. The Attorney General has no jurisdiction to interfere with local school board matters, as he is doing here. There is no general federal police power. In comparison, members of Antifa travel interstate to engage in their violence and domestic terrorism. Members of Antifa have used instruments that travel in interstate commerce to riot and loot and to destroy businesses that operate in interstate commerce. Yet, the Attorney General has done nothing to stop this national problem. Indeed, the Attorney General has not issued a "memorandum for" in the case of Antifa violence or in the case of BLM violence because these organizations promote a political viewpoint with which the Attorney General agrees.

60. Many parents and private citizens who share Plaintiffs' views consider the AG Policy "shocking." They are frightened and intimidated by the actions of the Attorney General. They believe that they are living in a time when they cannot speak up for their children and stand

up for what is right, moral, and just in America. The AG Policy is having its intended effect: it is chilling the speech of private citizens, including Plaintiffs, in violation of the First and Fifth Amendments to the U.S. Constitution.

61. The Attorney General has a family financial conflict of interest as he directs the FBI to investigate parents and other private citizens who are protesting against the use of public schools to indoctrinate children in CRT and other "progressive" Left dogma. The conflict stems from the fact that the Attorney General's son-in-law, Alexander "Xan" Tanner, the co-founder and president of Panorama Education, has a lucrative business promoting some of the objectional indoctrination materials—materials purchased by public school districts throughout the country. It is reported that "Panorama pushes race-focused surveys and conducts trainings on systemic oppression, white supremacy, unconscious bias, and intersectionality — all under the rubric of 'Social-Emotional Learning [(SEL)].'" Some of the relevant indoctrination materials include "SEL as Social Justice — Dismantling White Supremacism Within Systems and Self."

62. Parents and private citizens, including Plaintiffs, should not have to choose between defending their children by publicly opposing the implementation of the "progressive" agenda in their public schools or being subjected to government investigation, surveillance, or punishment.

63. The AG Policy has caused, and will continue to cause, irreparable harm to Plaintiffs and scores of other law-abiding citizens who want to speak up in defense of their children and against the divisive, harmful, immoral, destructive, and racist agenda of the "progressive" Left.

**FIRST CLAIM FOR RELIEF**

**(Free Speech and Expressive Association – First Amendment)**

64. Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

65. The AG Policy is a content- and viewpoint-based restriction on speech in violation of the First Amendment.

66. The AG Policy is government-sanctioned discrimination and censorship of free speech in violation of the First Amendment.

67. The AG Policy confers broad powers of censorship, in the form of a "heckler's veto," upon local school boards and school officials as well as government agents and officials who can censor, chill, or otherwise restrict constitutionally protected speech and engage in discriminatory practices with impunity by virtue of this power conferred by the federal government through the AG Policy, all in violation of the First Amendment.

68. The AG Policy permits local school boards and school officials as well as government agents and officials to censor, chill, and otherwise restrict Plaintiffs' speech based on the content and viewpoint expressed by Plaintiffs' message in violation of the First Amendment.

69. The freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech. Indeed, implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends free from government intrusions or burdens, such as those caused by the AG Policy. Accordingly, the AG Policy violates the right to expressive association protected by the First Amendment.

70. As set forth in this Complaint, the AG Policy deprives Plaintiffs of their fundamental right of expressive association in violation of the First and Fifth Amendments.

71. The AG Policy has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

72. As a direct and proximate result of the AG Policy, Plaintiffs have suffered irreparable harm, including the loss of their rights to free speech and expressive association, entitling them to declaratory and injunctive relief.

73. Plaintiffs lack an adequate or available administrative remedy.

74. Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their legal rights.

## SECOND CLAIM FOR RELIEF

### (Equal Protection — Fifth Amendment)

75. Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

76. By targeting peaceful, private citizens, including Plaintiffs, because they object to the "progressive" agenda, policies, and actions of local school boards and school officials while turning a blind eye to the violence perpetrated by Antifa and BLM protestors because they promote the "progressive" agenda, Defendant has deprived Plaintiffs of the equal protection of the law guaranteed under the Fifth Amendment to the United States Constitution.

77. The Supreme Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment. Consequently, case law interpreting the Equal Protection Clause of the Fourteenth Amendment is applicable when reviewing an equal protection claim arising under the Fifth Amendment's Due Process Clause, as in this case.

78. The AG Policy is targeting Plaintiffs and other similarly situated parents and private citizens for adverse treatment because of their viewpoint on political and social issues that are in the public interest while granting Antifa and BLM protestors favorable treatment because of their

viewpoint on political and social issues, all in violation of the equal protection guarantee of the Fifth Amendment.

79. By suppressing and burdening Plaintiffs' access to public forums to engage in their speech activities based on the content and viewpoint of their speech, which the Attorney General disfavors, the Attorney General and the AG Policy deprive Plaintiffs of the equal protection of the law in violation of the Fifth Amendment.

80. Defendant's discriminatory treatment of Plaintiffs in violation of the equal protection guarantee of the Fifth Amendment has caused and will continue to cause Plaintiffs to suffer undue hardship and irreparable injury.

**THIRD CLAIM FOR RELIEF**

**(Parental Rights – Fifth Amendment)**

81. Plaintiffs hereby incorporate by reference all stated paragraphs set forth herein.

82. The AG Policy unreasonably interferes with the liberty of parents and guardians, including certain Plaintiffs whose children attend SAS or LCPS, as set forth in this Complaint, to direct the upbringing and education of their children under their control in violation of the Fifth Amendment.

83. Defendant's violation of Plaintiffs' parental rights protected by the Fifth Amendment has caused and will continue to cause Plaintiff to suffer undue hardship and irreparable injury.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

A. That this Court declare that the AG Policy as set forth in this Complaint violates the First Amendment to the United States Constitution;

B. That this Court declare that the AG Policy as set forth in this Complaint violates the Fifth Amendment to the United States Constitution;

C. That this Court preliminarily and permanently enjoin the AG Policy and efforts to enforce it as set forth in this Complaint;

D. That this Court award Plaintiffs their reasonable costs, including attorneys' fees, pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, and the general legal and equitable powers of this Court;

E. That this Court grant such other and further relief as it deems equitable and just under the circumstances.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (DC Bar No. 978179)
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*