**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SALINE PARENTS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States of America, <br><br> *Defendant*. | Civil Case No. 1:21-cv-2775-DLF |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 4

    I.  Plaintiffs Challenge a Supposed "Attorney General Policy" ........................... 4

        A.  The Attorney General's October 4, 2021 Memorandum ........................... 5

        B.  The October 20, 2021 FBI email ............................................................ 6

        C  Allegations that Plaintiffs Have Been Labeled "Domestic Terrorists." ..................... 7

        D.  Allegations that Federal Agents Attended a School Board Meeting. ........................ 7

    II.  Plaintiffs' Factual and Legal Allegations ...................................................... 8

STANDARDS OF REVIEW .................................................................................. 10

ARGUMENT ......................................................................................................... 11

    I.  The Court's Evaluation of Jurisdiction and the Merits Must Be Limited to Plausibly Pleaded Allegations of Government Action. ............................................... 12

    II.  This Court Lacks Jurisdiction Over Plaintiffs' Amended Complaint. ........................... 15

        A.  Plaintiffs Lack Article III Standing. ....................................................... 16

            1.  Plaintiffs fail to plead an injury in fact. ................................................ 16

                a.  The *Susan B. Anthony* "chilling" injury test applies. ........................... 17

                b.  The Department's actions do not "arguably proscribe" Plaintiffs' purported conduct. ......................................................................... 18

                c.  There is not a substantial threat of future enforcement against Plaintiffs. ...... 20

            2.  Plaintiffs cannot establish that the Department caused them any injury, or that such injury would be redressable by an order of this Court. .......................... 22

                a.  The Memorandum and email merely reflect the current state of the law regarding true threats, and so do not itself injure Plaintiffs. ...................... 22

b.    Rescission of the Memorandum or email would not redress Plaintiffs' purported injury. ...................................................................................23

B.   Plaintiffs' Claims Are Unripe. ...................................................................................24

III. Plaintiffs Fail to State a Constitutional Claim. ..............................................................26

A.   Plaintiffs fail to state a claim that the alleged actions of the Department constitute an improper content-and-viewpoint-based restriction on speech. .............................26

B.   Plaintiffs fail to state a claim that the Department has violated their rights to equal protection. ...................................................................................................................29

1.   Plaintiffs Fail to Allege Facts Establishing Discriminatory Purpose. ..................30

2.   Failure to plead similarly situated persons. ..........................................................32

3.   Plaintiffs fail to properly plead that the Government has made distinctions based on viewpoint, and rational basis review applies—and the Government's actions were rational. ..................................................................33

C.   The Memorandum and email violate no parental rights. ...........................................35

IV.   The Department Has Not Violated RFRA .....................................................................36

CONCLUSION .....................................................................................................................39

## TABLE OF AUTHORITIES

**CASES**

*Abbott Labs v. Gardner,*
  387 U.S. 136 (1967) ............................................................................................24

*Archdiocese of Wash. v. WMATA,*
  897 F.3d 314 (D.C. Cir. 2018) ..........................................................................28

*\*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ....................................................................................*passim*

*Atl. States Legal Found, Inc. v. EPA,*
  325 F.3d 281 (D.C. Cir. 2003) ..........................................................................25

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................................17

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................................. 10, 12, 16

*Bell v. Keating,*
  697 F.3d 445 (7th Cir. 2012) ........................................................................18, 24

*Bellinger v. Bowser,*
  No. 17-cv-2134 (TJK), 2018 WL 4705808 (D.D.C. Sept. 30, 2018) ................31, 32

*Brown v. Fed. Election Comm'n,*
  386 F. Supp. 3d 16 (D.D.C. 2019) ....................................................................17

*Cement Kiln Recycling Coal. v. EPA,*
  439 F.3d 207 (D.C. Cir. 2007) ..........................................................................24

*City of Cleburne v. Cleburne Living Ctr.,,*
  473 U.S. 432 (1985) ............................................................................................32

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................21

*Clark v. Stone,*
  998 F.3d 287 (6th Cir. 2021), *cert. denied,* 142 S. Ct. 773 (2022) ........................17

*Community Fin. Servs. Ass'n of Am., Ltd. v. FDIC,*
  132 F. Supp. 3d 98 (D.D.C. 2015) ....................................................................24

*Cooper Hospital/University Med. Ctr. v. Burwell,*
179 F. Supp. 3d 31 (D.D.C. 2016),
*aff'd sub nom. Cooper Hosp. Univ. Med. Ctr. v. Price*, 688 F. App'x 11 (D.C. Cir. 2017) ......35

*Devia v. Nuclear Regul. Comm'n,*
492 F.3d 421 (D.C. Cir. 2007) ...........................................................25

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
878 F.3d 371 (D.C. Cir. 2017) ...........................................................16

*Frederick Douglass Found., Inc. v. District of Columbia,*
531 F. Supp. 3d 316 (D.D.C. 2021) ......................................................37

*Get Outdoors II, LLC v. City of San Diego, Cal.,*
506 F.3d 886 (9th Cir. 2007) ...........................................................23

*Henderson v. Kennedy,*
253 F.3d 12 (D.C. Cir. 2001) ...........................................................37

*Holt v. Hobbs,*
574 U.S. 352 (2015) ...................................................................37

*Jerome Stevens Pharm., Inc. v. FDA,*
402 F.3d 1249 (D.C. Cir. 2005) .........................................................10

*\*Kaemmerling v. Lappin,*
553 F.3d 669 (D.C. Cir. 2008) ......................................................37, 38

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994) ...................................................................15

*\*Laird v. Tatum,*
408 U.S. 1 (1972) ..............................................................17, 18, 21

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ..............................................................*passim*

*M.K. v. Tenet,*
99 F. Supp. 2d 12 (D.D.C. 2000) .......................................................34

*Mahoney v. Doe,*
642 F.3d 1112 (D.C. Cir. 2011) ........................................................37

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State,*
    851 F.3d 1 (D.C. Cir. 2017) ......................................................................20

*McInnis-Miesnor v. Maine Medical Ctr.,*
    319 F.3d 63 (1st Cir. 2003) .......................................................................25

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ...................................................................................35

*Muwekma Oholone Tribe v. Salazar,*
    708 F.3d 209 (D.C. Cir. 2013) ............................................................32, 33

*Nat'l Sec. Couns. v. CIA,*
    931 F. Supp. 2d 77 (D.D.C. 2013) ............................................................. 5

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) .................................................................25

*Nazareth Hosp. v. Sec'y, U.S. Dep't of Health & Human Servs.,*
    747 F.3d 172 (3d Cir. 2014) ......................................................................35

*Patel v. Ambit Grp.,*
    No. 18-2985 (RDM), 2019 WL 4472124 (D.D.C. Sept. 17, 2019),
    *aff'd,* No. 19-5283, 2020 WL 1918354 (D.C. Cir. Apr. 2, 2020) ...........13

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ...................................................................................30

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) ...................................................................................35

*Pinson v. U.S. Dep't of Justice,*
    No. 18-cv-486 (RC), 2021 WL 3418954 (D.D.C. Aug. 5, 2021) ............. 5

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ...................................................................................26

*Police Dep't of Chicago v. Mosley,*
    408 U.S. 92 (1972) .....................................................................................26

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ..............................................................................23, 28

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) .................................................................................26-27, 27

*Renne v. Geary,*
  501 U.S. 312 (1991) ............................................................................................10

*Rock the Vote v. Trump,*
  No. 20-cv-06021-WHO, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020) ..........................19, 21

*Rodriguez v. Maricopa Cty. Comm. Coll. Dist.,*
  605 F.3d 703 (9th Cir. 2010) .............................................................................23

*Salesian Soc'y, Province of St. Philip Apostle, Inc. v. Mayorkas,*
  No. 18-cv-0477 (EGS), 2021 WL 4306150 (D.D.C. Sept. 22, 2021) ....................................38

*Settles v. U.S. Parole Comm'n,*
  429 F.3d 1098 (D.C. Cir. 2005) .........................................................................32

*Shaffer v. Def. Intelligence Agency,*
  601 F. Supp. 2d 16 (D.D.C. 2009) ....................................................................16

*Smothers v. District of Columbia,*
  No. 19-cv-2632 (ABJ), 2020 WL 5411294 (D.D.C. Sept. 9, 2020) .................................30

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ...........................................................................................26

*Strzok v. Barr,*
  No. 19-cv-2367 (ABJ), 2019 WL 11343406 (D.D.C. Oct. 7, 2019) ...................................15

*Susan B. Anthony List v. Driehaus,* ("SBA"),
  573 U.S. 149 (2014) ..............................................................................16, 17, 20, 21

*Texas v. United States,*
  523 U.S. 296 (1998) .....................................................................................16, 24

*Thomas v. Review Bd. of Indiana Emp. Sec. Div.,*
  450 U.S. 707 (1981) ...........................................................................................37

*Trump v. New York,*
  141 S. Ct. 530 (2020) .......................................................................................24

*Tucker v. Branker,*
  142 F.3d 1294 (D.C. Cir. 1998) ........................................................................33

*Virginia v. Black,*
    538 U.S. 343 (2003) ......................................................................................................*passim*

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
    576 U.S. 200 (2015) ...........................................................................................2826, 27

*Walsh v. Brady,*
    927 F.2d 1229 (D.C. Cir. 1991) ...............................................................................33, 34

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia,*
    93 F.3d 910 (D.C. Cir. 1996) .........................................................................................32

*Woodhull Freedom Found. v. United States,*
    948 F.3d 363 (D.C. Cir. 2020) .......................................................................16, 17, 20, 21

*Wright v. Foreign Serv. Grievance Bd.,*
    503 F. Supp. 2d 163 (D.D.C. 2007),
    *aff'd* No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) .........................................10

*Zablocki v. Redhail,*
    434 U.S. 374 (1978) ......................................................................................................33

## STATUTE

42 U.S.C. § 2000bb-1(b) ...........................................................................................36, 39

## FEDERAL RULE

Federal Rule of Civil Procedure 8 ....................................................................................12

## OTHER SOURCES

Justice Department Addresses Rise in Criminal Conduct on Commercial Aircraft (Nov. 24,
    2021) ...........................................................................................................................29

Justice Department Launches Task Force to Combat Threats Against Election Workers (July 29,
    2021) ...........................................................................................................................29

Uniform Crime Reporting Program ..................................................................................5

## INTRODUCTION

On October 4, 2021, the Attorney General issued a five-paragraph memorandum to Department of Justice personnel entitled "Partnership Among Federal, State, Local, Tribal, and Territorial Law Enforcement to Address Threats Against School Administrators, Board Members, Teachers, and Staff" (the "Memorandum") [attached hereto as "Ex. A."]. That Memorandum had three parts. First, consistent with the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 359-60 (2003), the Memorandum acknowledged that "spirited debate about policy matters is protected under our Constitution," but that the First Amendment's "protection does not extend to threats of violence or efforts to intimidate individuals based on their views." Second, the Memorandum specified that the Department of Justice took such threats "seriously" and would announce future measures "designed to address the rise in criminal conduct directed toward school personnel." Finally, in the Memorandum's only directive provision, the Attorney General instructed Department personnel to engage in inter-governmental meetings with federal, state, local, Tribal, and territorial leaders to discuss "strategies for addressing threats" against school officials and to "open dedicated lines of communication" to address any such threats. Those meetings were to happen within 30 days, or by November 3, 2021. A few weeks later, the FBI announced in an email that it had created what it calls a "threat tag" for internal tracking of "investigations and assessments of threats specifically directed against" school officials, to enable the FBI to understand the scope of such threats of violence and "provide an opportunity for comprehensive analysis" of such threats (the "email") [attached hereto as "Ex. B."].

Neither the Memorandum nor the email imposed any new regulations, proscriptions, or requirements on private parties. They did not institute or otherwise set in motion any enforcement actions against private parties. And they did not impose or even purport to impose new or additional limits on any person's speech. Rather, they followed long-governing Supreme Court

doctrine regarding threats of violence and called for inter-governmental fact-finding on that issue. Plaintiffs nonetheless brought this suit, insisting that a purported "Attorney General Policy" violates their constitutional rights.

The policy that Plaintiffs purport to be challenging—supposedly "to use federal law enforcement resources to silence parents" who oppose certain school policies—does not exist, either as an express, acknowledged policy or as a policy that can be inferred from conduct. The Memorandum and the email are written documents that are clear on their face. Moreover, this Court can disregard Plaintiffs' allegations of a supposed "policy"—that the Department has designated Plaintiffs "domestic terrorists" and that the Department is monitoring school board meetings with federal agents—both as unsupported by any factual allegations in the Amended Complaint, and because the Amended Complaint's conclusory allegations do not satisfy the plausibility standard established by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

For a series of independent reasons, the case should be dismissed. To begin, the case should be dismissed for lack of Article III jurisdiction, on standing and ripeness grounds. As for standing, Plaintiffs plead no cognizable injury in fact. To establish injury under a theory of First Amendment "chilling," Plaintiffs would need to allege plausibly that their anticipated future conduct was "arguably proscribed" by the government action they challenge *and* that there is a credible and substantial threat of future enforcement of the challenged government policy against them. But neither the Memorandum nor the email imposes any restrictions on individuals at all, and certainly none on those who exercise their First Amendment right to express a viewpoint without resorting to intimidation, violence, or threats. Accordingly, Plaintiffs have not alleged that Defendants have imposed restrictions on individuals. Nor is there a credible threat that a memorandum calling for intergovernmental meetings, or internal directions about how to keep

track of threats of violence against school officials, could somehow be enforced against Plaintiffs. In addition, Plaintiffs have not alleged any purported injury traceable to Defendants or redressable by injunctive relief, most notably because the Memorandum reflects existing First Amendment law and does not purport to change the governing legal standards, and so cannot itself injure Plaintiffs. And if there were standing, the case is unripe.

Even if Plaintiffs' claims were justiciable, they would be meritless. Fundamentally, Plaintiffs' allegations that the Memorandum or email constitutes content and viewpoint discrimination fail, because neither regulates private speech—much less based on content or viewpoint. In any event, the Supreme Court has long made clear that true threats—the subject of the Memorandum and email—are not entitled to First Amendment protection.

Nor have Plaintiffs presented a viable equal protection claim concerning alleged political targeting. They do not plausibly allege, as required by *Iqbal*, that the Department acted with a discriminatory purpose, or that they are subject to some restriction from the Memorandum or email while being similarly situated to others with different political views who are not. Indeed, they do not plead facts establishing that any distinctions in the Memorandum or email were based on Plaintiffs' viewpoint. It was far from irrational for the Department to task its officials with studying threats of violence against school officials, and nothing about the Department's actions violates equal protection principles.

Next, Plaintiffs cannot establish that the Department has violated their constitutionally protected parental rights. The Constitution does not authorize otherwise prohibited true threats against school officials, nor does the Memorandum or email infringe upon any constitutionally protected rights.

Finally, while Plaintiffs have brought a Religious Freedom Restoration Act claim, they have not pled facts establishing that their religious exercise is "substantially burdened" by the Department, let alone that the other requirements of RFRA are satisfied.

For these reasons, and those set out in more detail below, this Court should dismiss Plaintiffs' Amended Complaint.

## **BACKGROUND**

I.   **Plaintiffs Challenge a Supposed "Attorney General Policy"**

In their Amended Complaint, Plaintiffs challenge a purported "policy" of the Attorney General allegedly to "use federal law enforcement resources to silence parents and other private citizens who publicly object to and oppose . . . [progressive policies] that are being implemented by school boards and school officials in public school districts throughout the United States." Am. Compl. ¶ 2. Plaintiffs have not plausibly pleaded that any such policy exists, and, as an application of the pleading rules, this Court need not credit conclusory allegations not based on plausibly pleaded facts.

While Plaintiffs fail to define the elements of the supposed "AG Policy" with any specificity—and do not attach or allege any document summarizing any such a policy—they appear to rely on four alleged elements:

- *First*, an October 4, 2021 Memorandum from the Attorney General stating that the Department of Justice took threats of violence against school officials seriously, and that the Department would organize intergovernmental meetings to discuss such threats, *e.g.*, Am. Compl. ¶¶ 69-72.

4

- *Second*, an October 20, 2021 FBI email providing additional information on how to track "investigations and assessments of threats specifically directed against school board administrators, board members, teachers, and staff," *e.g.*, Am. Compl. ¶¶ 84-86.[1]

- *Third*, unadorned assertions that Plaintiffs have been labeled, considered, or targeted as "domestic terrorists," apparently and allegedly as a result of this policy, *e.g.*, Am. Compl. ¶¶ 38, 65, 66, 79, 94.

- *Finally*, on one occasion on October 21, 2021, federal agents (allegedly of the Department of Homeland Security) "were present at a school board meeting held in Fairfax, Virginia." Am. Compl. ¶ 87.[2]

### A.  The Attorney General's October 4, 2021 Memorandum

On October 4, 2021, the Attorney General issued the Memorandum. *See* Ex. A.[3]  That Memorandum clearly stated that it was addressing "illegal" threats of violence and did not address, much less purport to limit, any speech protected by the First Amendment. *Id.*

The Memorandum began by noting that "[i]n recent months, there has been a disturbing spike in harassment, intimidation, and threats of violence against school administrators, board

---

[1] The FBI has tracked voluntarily provided crime statistics provided by participating local, county, state, tribal, and federal law enforcement agencies since 1930.  *See* Uniform Crime Reporting Program, https://www.fbi.gov/services/cjis/ucr.

[2] The Memorandum and email are repeatedly referenced in Plaintiffs' Amended Complaint, and, as documents they seek to enjoin, are integral to their claims. *See, e.g.*, Am. Compl. ¶¶ 69-72, 84-86, Prayer for Relief ¶¶ A-D. "But 'while a court may not consider matters outside the pleadings in evaluating a motion to dismiss under Rule 12(b)(6) without converting the motion to one for summary judgment under Rule 56, documents that are referenced in, or are an integral part of, the complaint are deemed not outside the pleadings.'" *Pinson v. U.S. Dep't of Just.*, No. 18-cv-486 (RC), 2021 WL 3418954, at n.4 (D.D.C. Aug. 5, 2021) (quoting *Nat'l Sec. Couns. v. CIA*, 931 F. Supp. 2d 77, 102 n.14 (D.D.C. 2013)) (internal quotation marks, and citation omitted).

[3] *Also available at*: https://www.justice.gov/ag/page/file/1438986/download.

members, teachers, and staff." *Id*.  It went on to note, consistent with Supreme Court precedent, *see Virginia v. Black*, 538 U.S. 343, 359-60 (2003), that "[w]hile spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views." Ex. A.

Next, the Memorandum expressed a commitment to respond to such illegal threats of violence, stating that: "The Department takes these incidents seriously and is committed to using its authority and resources to discourage these threats, identify them when they occur, and prosecute them when appropriate." *Id*.

Finally, the Memorandum announced its only concrete tasking.   After noting that "[c]oordination and partnership with local law enforcement is critical to implementing these measures [designed to address the rise in criminal conduct directed toward school personnel] for the benefit of our nation's nearly 14,000 public school districts," the Memorandum directed Department of Justice personnel to:

> [C]onvene meetings with federal, state, local, Tribal, and territorial leaders in each federal judicial district within 30 days of the issuance of this memorandum [*i.e.*, by November 3, 2021]. These meetings will facilitate the discussion of strategies for addressing threats against school administrators, board members, teachers, and staff, and will open dedicated lines of communication for threat reporting, assessment, and response.

*Id*.

The Memorandum closed by stating that "[t]he Department is steadfast in its commitment to protect all people in the United States from violence, threats of violence, and other forms of intimidation and harassment." *Id*.

### B.  The October 20, 2021 FBI email

On October 20, 2021, the FBI Criminal Investigation Division and Counterterrorism Division sent an email to various FBI officials.  *See* Am. Compl. ¶ 84-86; *see also* Ex. B.  After

summarizing the Memorandum, the email stated that "[w]e all share an obligation to ensure all individuals are able to do their jobs without threats of violence or fear for their safety." This obligation can "only be accomplished with effective coordination internally between relevant Divisions and through effective coordination and engagement with our law enforcement partners and United States Attorney Offices." Ex B.

The email announced the creation of what FBI calls a "tag," to be used by FBI "to track instances of related threats." Ex. B. The tag was to be applied "to investigations and assessments of threats specifically directed against school board administrators, board members, teachers, and staff." Ex. B. The tag was intended to help provide a systematic, national assessment of threats of violence against school officials. *See* Ex. B. The email further requested that FBI officials evaluate, among other things, whether such threats might have a federal predicate or could be the basis of a potential federal criminal violation. *See* Ex. B. Plaintiffs do not plausibly allege that any of their actions would have met any criteria of true threats directed against school officials, such that this "tag" would be applicable to them. *See generally* Ex. B; Am. Compl.

### C.  Allegations that Plaintiffs Have Been Labeled "Domestic Terrorists."

Throughout the Amended Complaint, Plaintiffs assert that "[a]s a direct result of the challenged AG Policy, Plaintiffs have been labeled and targeted as domestic terrorists by the Attorney General of the United States." Am. Compl. ¶ 38; *see also id.* ¶¶ 65, 66, 79, 93, 94 (same or similar). Plaintiffs do not allege any facts supporting this claim. They do not plead the existence of any statements by the Attorney General or actions of the Department that labeled them as domestic terrorists, nor do they reference any documents that memorialize any such determination.

### D.  Allegations that Federal Agents Attended a School Board Meeting.

Finally, Plaintiffs allege that "pursuant to the AG Policy, federal agents in marked and unmarked vehicles were present at a school board meeting held in Fairfax, Virginia," on or about

October 21, 2021. Am. Compl. ¶ 87. Plaintiffs specifically reference a "marked Homeland Security vehicle present outside of this school board meeting." *Id*. Notably, none of the Plaintiffs allege that they are residents of Fairfax County. *See id*. ¶¶ 13-37. And Plaintiffs allege nothing to suggest that those "federal agents" sought or attempted to curtail discussion on any issue at the school board meeting.

## II.   Plaintiffs' Factual and Legal Allegations

Plaintiffs—six individuals and one unincorporated association—originally filed this lawsuit on October 19, 2021, and the operative Amended Complaint was filed on January 17, 2022. One plaintiff, Raelyn Davis, is a resident of Saline, Michigan, and has two children currently enrolled in the Saline Area Schools ("SAS") public school district. *See* Am. Compl. ¶ 13. She is also a member and director of plaintiff Saline Parents, which is alleged to be an association that opposes the curricula and policies of the SAS district. *Id*. ¶¶ 79-12. Davis alleges that she "strongly and publicly object[s] to and oppose[s]" SAS curricula and policies. *Id*. ¶ 16; *see also id*. ¶ 14 (stating that Davis has "publicly opposed at school board meetings and elsewhere" SAS curricula and policies).

The other five plaintiffs are residents of Loudoun County, Virginia, and they allege that their taxes support Loudoun County Public Schools ("LCPS"), and, in some cases, that they either have or had children in LCPS schools. *See* Compl. ¶¶ 17-37. Each makes the same allegation: that they are an "outspoken public critic of LCPS" and its alleged policies. *See id*. ¶ 20 (plaintiff Van Fleet); ¶ 22 (plaintiff Mobley); ¶ 24 (plaintiff Rivera); ¶ 26 (plaintiff Cooper); *see also id*. ¶ 27 (link to a video of plaintiff Cooper addressing the LCPS school board); ¶¶ 29-37 (plaintiff Brand); *see also id*. ¶ 30 (link to an editorial written by plaintiff Brand regarding LCPS actions).

Collectively, Plaintiffs assert their rights to "publicly object," including "vociferously and even stridently" to SAS and LCPS's curricula and policies. Am. Compl. ¶ 43. Plaintiffs also state that they "express their outrage and objections to these programs during school board meetings . . . and in other public forums." *Id.* ¶ 64.

In their lawsuit, Plaintiffs challenge a purported "AG Policy." They assert that the purported policy was "intentionally designed (its intended purpose and effect) to chill parents and other private citizens, including Plaintiffs, from publicly expressing their opposition to the 'progressive' agenda being implemented by government officials in the public schools and thereby silent such expression." *Id.* ¶ 68; *see also id.* ¶ 95 ("Because of the AG Policy, public school boards and school officials know that they can now chill and indeed silence the speech of the opposition by claiming that it is 'harassing' or 'intimidating,' or 'threatening.'"); *id.* ¶ 99 (alleging that "[m]any parents and private citizens who share Plaintiffs' views" find the AG Policy "shocking" and are "frightened and intimidated" by it).

Plaintiffs bring four legal claims for relief. The first three are brought directly under the U.S. Constitution. *First*, they allege that the Department's actions are a "content-and viewpoint-based restriction on speech in violation of the First Amendment," Am. Compl. ¶ 109, because it "confers broad powers of censorship, in the form of a 'heckler's veto,'" upon government officials, *id.* ¶ 111. *See also id.* ¶ 112 ("The AG Policy permits local school boards and school officials as well as government agents and officials to censor, chill, and otherwise restrict Plaintiffs' speech based on the content and viewpoint expressed by Plaintiffs' message in violation of the First Amendment."). *Second*, Plaintiffs argue that the Department violates the Fifth Amendment's equal protection components by allegedly "targeting" plaintiffs "because of their political ideology and religious beliefs," while permitting violence by those who "promote the 'progressive' agenda."

*Id.* ¶¶ 121, 122.  *Third*, Plaintiffs aver that the Department "unreasonably interferences with the liberty of parents and guardians . . . to direct the upbringing and education of their children under their control in violation of the Fifth Amendment."  *Id.* ¶ 127.  *Finally*, Plaintiffs argue that the Department "violates the Religious Freedom Restoration Act."  *Id.* ¶ 130.

## STANDARDS OF REVIEW

Plaintiffs bears the burden of demonstrating subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Courts should "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record."  *Renne v. Geary*, 501 U.S. 312, 316 (1991) (citations omitted).  "Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007), *aff'd*, No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (internal citations omitted).  The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations omitted).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face."  *Ashcroft*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citation omitted).  The plaintiff must, accordingly, plead facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged" and offer "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.

10

## ARGUMENT

This Complaint should be dismissed for two independently dispositive reasons: The Court lacks jurisdiction, and Plaintiffs fail to state a claim upon which relief can be granted.

At the motion-to-dismiss phase, the Court must credit Plaintiffs' well-pleaded factual allegations, but only if they are nonconclusory and plausible.  Although the premise of the Complaint is that there exists an overarching "AG Policy," the Court need not defer to Plaintiffs' characterizations of their factual allegations and need not accept mere conclusions not based on plausible allegations.

Plaintiffs also lack standing—they cannot plead injury in fact, causation, or redressability—and, in any event, the case is not ripe.

On the merits, Plaintiffs have not pled a plausible First Amendment violation, because the Memorandum imposes no content or viewpoint-based discrimination, and the kinds of true threats that the Memorandum addresses are not protected by the First Amendment.  Plaintiffs' equal protection claim also fails; they have not pleaded facts showing that the Attorney General acted with a discriminatory purpose in issuing the Memorandum or email, or that Plaintiffs are similarly situated to another relevant group.  Nor have they pled facts indicating that the Attorney General discriminated on the basis of viewpoint; thus, the only relevant constitutional standard is rational basis, and Plaintiffs have not pled facts establishing that the government's basis for focusing on threats against school officials was not rational.  Plaintiffs' constitutionally protected parental rights are not implicated by the Department's efforts to work in partnership with other law enforcement officials concerning threats against school personnel.  Finally, Plaintiffs' RFRA challenge fails because they have not adequately pled that the Department has substantially burdened their exercise of religion.

I.      **The Court's Evaluation of Jurisdiction and the Merits Must Be Limited to Plausibly Pleaded Allegations of Government Action.**

As an initial matter, Plaintiffs fail to plead the existence of an actual "AG Policy," as required under Federal Rule of Civil Procedure 8. Plaintiffs do not allege the existence of any document—formal or informal—that articulates a policy "to use federal law enforcement resources to silence parents and other private citizens" who object to certain school policies. *See* Am. Compl. ¶ 2. Nor do they reference any statements by the Attorney General, or anyone working under his direction, that would support the existence of such a policy, much less the elements alleged by Plaintiffs. Instead, they highlight four separate actual or alleged actions—the Memorandum, the email, the alleged domestic terror "labeling," and the alleged presence of parked law enforcement cars outside a Fairfax County school board meeting in October 2021—and claim that these are all the result of a single "policy." But Plaintiffs fail to plead facts that suffice under *Iqbal* to plead the existence of the "domestic terrorism" labeling or school board meeting monitoring by Department of Justice officials. Accordingly, for the purposes of Rule 8 and this motion, all they have properly pled—and all they may challenge—are the Memorandum and the email.

"[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 555 U.S. at 557). "[C]onclusory statements" do not suffice, nor do complaints that plead only the "mere possibility of misconduct," as opposed to a "plausible claim for relief."

*Id.* at 678-79; *see also id.* at 681 ("bare assertions" that are "conclusory" are "not entitled to be assumed true.").

With respect to the domestic terrorism and school board monitoring allegations, Plaintiffs offer only bare, conclusory allegations; these are insufficient under *Iqbal*. Plaintiffs assert no fewer than eight times that they are being labeled by the Attorney General as domestic terrorists. *See* Am. Compl. ¶¶ 20, 38, 65, 66, 79, 84, 93, 94. But Plaintiffs fail to offer any "non-conclusory factual allegations" in support of this assertion. *E.g.*, *Patel v. Ambit Grp.*, No. 18-cv-2985 (RDM), 2019 WL 4472124, at *1 (D.D.C. Sept. 17, 2019), *aff'd*, No. 19-5283, 2020 WL 1918354 (D.C. Cir. Apr. 2, 2020). They do not allege the existence of any Department of Justice statement or document that labels any of them as domestic terrorists. They do not allege that any communications from the Department to them (or to a third party) imposes such a label. They do not even allege that any specific policy attributable to the Department states that it *will* label persons—even those accused of true threats against school officials—as domestic terrorists. In short, all they have are "naked assertions" that the Attorney General has labeled them domestic terrorists, and that is not enough to surmount the motion to dismiss stage.

There are more reasons why their allegations fail to comport with *Iqbal*. The apparent basis for Plaintiffs' "domestic terrorist" allegation is a September 29, 2021 letter from the National School Boards Association ("NSBA") to President Biden, in which the NSBA requested assistance from federal law enforcement regarding threats of violence against school officials. *See* Am. Compl. ¶¶ 93-94 (referencing NSBA letter); Ltr. from Viola M. Garcia & Chip Slaven to Joseph R. Biden, Jr (Sept. 29, 2021) [hereinafter "NSBA Ltr."].[4] That letter stated, *inter alia*, that "[a]s

---

[4] *Available at* https://www.nsba.org/-/media/NSBA/File/nsba-federal-assistance-letter-9292021.pdf.

these acts of malice, violence, and threats against public school officials have increased, the classification of these heinous actions could be equivalent to a form of domestic terrorism and hate crimes." NSBA Ltr. at 2. The NSBA later stated that it "regret[s] and apologize[s] for the letter." *See* Ltr. from NSBA Bd. of Directors to NSBA Members (Oct. 22, 2021).[5]

But most important for present purposes is that Plaintiffs do not plead facts that, taken as true, establish that either the Attorney General or the Department ever labeled Plaintiffs domestic terrorists. The Department did not adopt, rely on, or otherwise express support for the NSBA's statement regarding domestic terrorism, nor did the Memorandum or FBI email reference domestic terrorism, much less label Plaintiffs or others as domestic terrorists. The increasingly implausible strings of assumptions built into Plaintiffs' assertions are threadbare and strain credulity: (1) that the Department of Justice took the view espoused by a private entity that true threats against school officials "could be equivalent to a form of domestic terrorism," and (2) adopted a policy that not only *were* such threats domestic terrorism, but (3) that individuals who apparently *did not commit* such true threats were nonetheless labeled domestic terrorists; even though (4) the Department did not publish or codify this position in any way, or take any action based on that conclusion. The allegation is simply not "plausible," given the facts pled. *Iqbal*, 556 U.S. at 663.

Nor is it plausible that "federal agents in marked and unmarked vehicles" were present at a Fairfax County school board meeting "pursuant to the AG Policy" in order to infringe upon Plaintiffs' rights. *See* Am. Compl. ¶ 87. This allegation is supported by a "photograph of a marked Homeland Security vehicle present outside" a school board meeting in Fairfax, Virginia. *Id*. The Department of Homeland Security is a separate agency from the Department of Justice; so the presence of a Homeland Security vehicle would not tend to support the existence of an AG Policy.

---

[5] *Available at* https://www.osba.org/News-Center/News_releases/20211022NSBA.aspx

That is particularly so given that Plaintiffs do not allege that federal agents made their presence known at the meeting itself (or even that Plaintiffs themselves were *present* at the meeting, which stands to reason, given that Fairfax, Virginia, is not within Loudoun County). Plaintiffs fail to rebut the "obvious alternative explanation" for the presence of these vehicles, including that the presence of the agent(s) was for some other law enforcement purposes or simply reflected a parent present in a personal capacity.[6] *See Iqbal*, 556 U.S. at 682 (concluding that "discrimination is not a plausible conclusion" in light of the "obvious alternative explanation" for defendants' action). This does not "nudge" their claims "across the line from conceivable to plausible." *Id.* at 683 (quoting *Twombly*, 550 U.S. at 570).

Accordingly, all Plaintiffs have plausibly pled is that the Attorney General issued a Memorandum on October 4, 2021, and the FBI sent a follow-up email on October 20, 2021. Those documents speak for themselves, and those actions—whether called an "AG Policy" or not—present the only facts that could form the basis for Plaintiffs' complaint. But as explained further below, *infra* at III.A, nothing in those documents can plausibly be characterized as amounting to a determination to label Plaintiffs as terrorists and to suppress their speech, as Plaintiffs allege.

## II.     This Court Lacks Jurisdiction Over Plaintiffs' Amended Complaint.

"Federal courts are courts of limited jurisdiction and the law presumes that 'a cause lies outside this limited jurisdiction.'" *Strzok v. Barr*, No. 19-cv-2367 (ABJ), 2019 WL 11343406, at * 1 (D.D.C. Oct. 7, 2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). This "case or controversy requirement" mandates that plaintiffs have (1) Article III

---

[6] Plaintiffs allege that the Homeland Security vehicle was accompanied by "unmarked vehicles." Am. Compl. ¶ 87. They do not explain how "unmarked vehicles"—*i.e.*, vehicles that could not be identified as police vehicles—would serve to chill speech. More significantly, they do not allege that any agents that may have been present in the alleged unmarked vehicles were employed by the Department of Justice.

standing at the time the plaintiff files their complaint, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and (2) that the case is ripe, *i.e.*, it does not "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Shaffer v. Def. Intelligence Agency*, 601 F. Supp. 2d 16, 23 (D.D.C. 2009) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Here, Plaintiffs have failed to adequately plead either of these jurisdictional requirements, and so this Court should dismiss this case for lack of subject-matter jurisdiction.

### A. Plaintiffs Lack Article III Standing.

"To establish standing, the plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that it is 'likely' to be 'redressed by a favorable decision,' i.e., a decision granting the plaintiff the relief it seeks." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376-77 (D.C. Cir. 2017) (quoting *Lujan*, 504 U.S. at 560-61)). Plaintiffs cannot satisfy any of these three requirements.

### 1. Plaintiffs fail to plead an injury in fact.

In order to invoke this Court's jurisdiction, Plaintiffs must have an injury in fact – *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and internal citations omitted). Plaintiffs claim that the Department has injured them by "chilling" their future speech in violation of the First Amendment. *See, e.g.*, Am. Compl. ¶¶ 71, 83, 87 99. To allege a "sufficiently imminent injury for the purposes of Article III" in a chilling challenge, plaintiffs must satisfy the three-part test established by the Supreme Court in *Susan B. Anthony List v. Driehaus* ("*SBA*"), 573 U.S. 149, 151 (2014). *See Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370-71 (D.C. Cir. 2020) (laying out *SBA* test). They cannot do so.

### a. The *Susan B. Anthony* "chilling" injury test applies.

*SBA* sets out three requirements that plaintiffs must satisfy to successfully establish injury based on a purported chill of their constitutional rights.  *First*, the plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest," *SBA*, 573 U.S. at 162 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

*Second*, the intended future conduct must be "arguably . . . proscribed by [the] [government action] they wish to challenge."[7]  *Id.* (quoting *Babbitt*, 442 U.S. at 298).  Not just any type of government action can give rise to a chilling injury claim: rather, "the challenged exercise of governmental power [must be] regulatory, proscriptive, or compulsory in nature." *Laird v. Tatum*, 408 U.S. 1, 11 (1972); *see also Clark v. Stone*, 998 F.3d 287, 296 (6th Cir. 2021) (applying "regulatory, proscriptive, or compulsory" government action requirement to chilling claim), *cert. denied*, 142 S. Ct. 773 (2022); *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012).

*Third*, there must be a "credible threat of prosecution," such that the "threat of future enforcement of the [challenged government action] is substantial." *SBA*, 573 U.S. at 159, 162, 164.  Importantly, that threat of future enforcement is measured objectively: "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972); *see also Woodhull Freedom Found.*, 948 F.3d at 371 ("Although lower courts' willingness to permit pre-enforcement

---

[7] Moreover, in a pre-enforcement challenge at the motion to dismiss stage, as here, the Court itself must determine whether the plaintiff's conduct is "arguably . . . proscribed by" the challenged government action. Accordingly, the Court must construe the legal effect of the challenged government action as part of the standing inquiry, even though normally it would assume plaintiffs' view of government action for standing purposes. *Woodhull Freedom Found*, 948 F.3d at 371; *see also SBA*, 573 U.S. at 162 (construing—rather than assuming plaintiff's interpretation of—challenged statute to determine whether plaintiffs conduct is "arguably proscribed"); *Brown v. Fed. Election Comm'n*, 386 F. Supp. 3d 16, 28 (D.D.C. 2019) (looking as to whether it is "reasonably clear" that plaintiff's conduct will fall within the relevant statute).

review is at its peak when claims are rooted in the First Amendment, a plaintiff must still demonstrate more than a subjective chill to establish an injury-in-fact.") (internal citations and quotation marks omitted).

Plaintiffs cannot meet these standards. The premise of Plaintiffs' complaint is that the Department has chosen viewpoints to prefer and that "outspoken, public critic[s]" of such policies must therefore stand down. Am. Compl. ¶¶ 20, 22, 24, 26. But the Memorandum and email say nothing of the sort. They do not restrict or otherwise chill speech. Indeed, the Memorandum emphasizes explicitly that "spirited debate about policy matters is protected under our Constitution." *See* Ex. A. Nor do Plaintiffs' speculative allegations about labeling and parked cars assist them. Both allegations are conclusory and should not be credited. *See supra* at I. And neither shows that the Department of Justice has exercised "regulatory, compulsory, or proscriptive" power, or that future prosecution is credible. Plaintiffs thus cannot satisfy the second and third prongs of *SBA*.

### b. The Department's actions do not "arguably proscribe" Plaintiffs' purported conduct.

The Department's actions that Plaintiffs have in fact alleged do not even "arguably proscribe," much less actually prohibit, either conduct or speech. Rather, the Memorandum directs Department personnel "to convene meetings with federal, state, local, Tribal, and territorial leaders" in order to discuss "strategies for addressing threats against school administrators, board members, teachers, and staff." Ex. A. Holding inter-governmental meetings and contemplating the issuance of future policies or undefined future actions is not a "regulatory, proscriptive, or compulsory" "exercise of governmental power," as required for a claim of chilling injury. *Laird*, 408 U.S. at 11. As detailed above, the Memorandum did not impose any new regulations, proscriptions, or requirements on private parties. And the email itself merely directs the FBI to

18

keep track of "investigations and assessments of threats specifically directed" against school officials.  Ex. B.  That, too, is not a regulation, proscription, or requirement; it is an internal government mechanism to keep track of threats of violence against school officials.

*Rock the Vote v. Trump* is instructive.  No. 20-cv-06021-WHO, 2020 WL 6342927 (N.D. Cal. Oct. 29, 2020).  In that case, plaintiffs challenged an Executive Order that directed executive agencies to narrowly construe a section of the Communications Decency Act, and to propose regulations to clarify that provision moving forward.  Plaintiffs challenged the Executive Order, premised upon a chilling theory of injury.  The Court rejected their allegations of standing.  The Court noted that "[t]he Executive Order does not directly regulate or restrict the speech of online platforms," but rather "outlines a policy goal of promoting unbiased content management on the internet and orders executive departments and agencies to take various steps that purportedly aim to further this goal."  *Id.* at *7.  Accordingly, "[n]one of [the] actions proscribe any constitutional right because they do not restrict or regulate the platforms directly, they are simply steps that may or may not lead to additional regulations, restrictions, or liability at some uncertain point in the future."  *Id.*  So too here: the Memorandum and email do not "restrict or regulate," but merely instructs Department officials to take steps that may lead to future actions designed to address true threats—not speech protected by the First Amendment.

Plaintiffs also fail the "arguably proscribe" requirement of *SBA* because their only allegations are related to speech that is protected by the First Amendment and not covered by the Memorandum or email.  Their allegations describe speech that is precisely the "spirited debate about policy matters" that the Memorandum explicitly recognizes "is protected under our Constitution."  Ex. A.  They do not allege that they intend to engage in behavior that is even plausibly close to "threats of violence or efforts to intimidate individuals based on their views."

Ex. A; *see also* Ex. B. (tracking "threats of violence").  Absent some intent to engage in behavior that arguably falls within the scope of the Memorandum or email (and there is none), Plaintiffs lack standing to challenge their terms.  To be sure, the Supreme Court does not require that "a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *SBA*, 573 U.S. at 163 (citation omitted).  But Plaintiffs must still plead facts establishing future conduct that could plausibly come within the Memorandum or email's ambit.  *See id.* (finding standing based on the fact that the government had previously taken action against the plaintiffs and that "there is every reason to think that similar speech in the future will result in similar proceedings.").  Here, they do not plead any facts indicating an intent to engage in conduct arguably proscribed by the Memorandum and email (which, again, reflects existing law and on its own proscribes nothing).

### c. There is not a substantial threat of future enforcement against Plaintiffs.

In any event, Plaintiffs independently lack standing because there is not a "substantial" "threat of future enforcement" against them.  *Woodhull Freedom Found.*, 948 F.3d at 373 (quoting *SBA*, 573 U.S. at 164); *see also Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 4 (D.C. Cir. 2017) ("But there is something fundamental to a pre-enforcement challenge that is missing here.  There must be some desired conduct by the plaintiff that might trigger an enforcement action in the first place.").  Along with imposing no substantive proscriptions, the Memorandum does not institute or otherwise put in motion any enforcement actions against any private parties, including Plaintiffs.  As explained, it calls for partnership and coordination between federal and nonfederal officials in assessing possible violence.  *See* Ex A. And the email merely sets up a way for the FBI to keep track of threats of violence against school officials.  *See* Ex. B. Neither of these documents directs enforcement of any kind, much less against Plaintiffs based on

the conduct they state they have engaged in and will continue to engage in.  *See Rock the Vote*, 2020 WL 6342927, at *7 (holding that "[a]ny potential enforcement based on . . . possible future regulations [that may be issued based on the Executive Order at issue] is far too speculative to give rise to a concrete or particularized injury at this point in time."). Nor have Plaintiffs identified a "history of past enforcement" with respect to their conduct vis-à-vis school meetings or officials. *See SBA*, 573 U.S. at 164 ("We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical.") (citation and quotation marks omitted); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013) (failure to offer evidence of allegedly chilling conduct "substantially undermines [plaintiffs'] standing theory"). Just the opposite—at least one plaintiff, Cooper, includes a video in the Amended Complaint of her "passionately addressing the LCPS school board in opposition" to its policies, without ever alleging any past, present, or future consequences of such actions.[8]  *See* Am. Compl.  ¶ 27.

***

Absent well-pleaded facts showing their intent to engage in conduct arguably proscribed by the Memorandum or email *and* a substantial threat of prosecution—neither of which is present—Plaintiffs cannot make out an objective fear of chilling, and thus cannot establish Article III standing.  *Laird*, 408 U.S. at 13-14; *Woodhull Freedom Found.*, 948 F.3d at 371.

---

[8] Plaintiff Brand alleges that she was targeted by a "Facebook group called the "Anti-Racist Parents of Loudon County," Am. Compl. ¶ 31, and that she was "falsely labeled as 'Alt-Right' by some government officials," *id.* ¶ 37.  The former allegation does not involve any state action, and Plaintiff Brand does not specify which "government officials" so labeled her, much less that officials *of the Department* did so.

### 2. Plaintiffs cannot establish that the Department caused them any injury, or that such injury would be redressable by an order of this Court.

Even if Plaintiffs had adequately pled injury in fact, they have not pled facts showing that there is a "causal connection between the injury [*i.e.*, the purported chilling of their First Amendment rights] and the conduct complained of," such that the injury is "fairly trace[able] to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal citation and alterations omitted). Plaintiffs allege that the "AG Policy['s]" articulation of First Amendment law will cause local officials to "chill and indeed silence the speech of the opposition." *See* Am. Compl. ¶ 95; *see also id.* ¶ 112 ("The AG Policy permits local school boards and school officials as well as government agents and officials to censor, chill, and otherwise restrict Plaintiffs' speech."). The actions of the Department do none of these things.

### a. The Memorandum and email merely reflect the current state of the law regarding true threats, and so do not itself injure Plaintiffs.

Because the Memorandum and email accurately reflect existing law, and do not create new legal standards, Plaintiffs cannot plausibly allege that these documents cause them injury. In a prefatory paragraph, the Memorandum notes that "[w]hile spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views." Ex. A; *see also id.* ("The Department is steadfast in its commitment to protect all people in the United States from violence, threats of violence, and other forms of intimidation and harassment."). The email similarly only references "threats of violence." Ex. B. These materials simply follow governing Supreme Court law, which makes clear that prohibitions against "true threats"—to include threats of violence and intimidation—do not violate the First Amendment. *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 359 (2003) ("'True

threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular group of individuals."); *id.* ("[T]hreats of violence are outside the First Amendment") (quoting *R.A.V. v. City of St. Paul.*, 505 U.S. 377, 388 (1992)); *see also id.* at 460 ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death."); *Rodriguez v. Maricopa Cty. Comm. College Dist.*, 605 F.3d 703, 710 (9th Cir. 2010) ("Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment.") (citing *R.A.V.*, 505 U.S. at 389-90). Plaintiffs cannot plausibly claim to be chilled by a Memorandum or email that accurately follows decisions of the Supreme Court on the scope of the First Amendment.

### b. Rescission of the Memorandum or email would not redress Plaintiffs' purported injury.

Plaintiffs similarly fail to establish redressability, *i.e.*, that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation and internal quotation marks omitted). Here, Plaintiffs have not pled facts showing that vacatur of the Memorandum would be likely to remedy their purported chilling injury. Indeed, precisely because the Memorandum does not change the law in any way, federal, state, and local officials may prosecute true threats in precisely the same way as they could before the Memorandum was ever issued. Regardless of the Memorandum, Plaintiffs could not engage in true threats absent the potential for legal consequences. But because this is so, vacating the Memorandum would not redress any potential future injury—since the same set of legal permissions and prohibitions on their behavior would exist after the memo was vacated as before. *See, e.g.*, *Get Outdoors II, LLC v. City of San Diego, Ca.l*, 506 F.3d 886, 895 (9th Cir. 2007)

(holding that plaintiff lacked redressability when it challenged a permit procedure, but where "[n]o change in the permit procedure would result in the approval of the permits it requests."); *Community Fin. Servs. Ass'n of Am., Ltd. v. FDIC*, 132 F. Supp. 3d 98, 112 (D.D.C. 2015) (concluding that plaintiffs had pled that invalidation of agency documents would have a "'substantial likelihood' of redressability" when they pled facts showing that such invalidation would "affect Defendants' ability to pressure banks in the future," or that the guidance documents were the "fulcrum" of existing agency strategy). The email—which simply sets up a way for the FBI to keep track of threats of violence against school personnel— also does not alter the legal landscape, and thus vacatur would not remedy any purported chilling injury.

## B. Plaintiffs' Claims Are Unripe.

Article III also requires that a "case must be 'ripe'—not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also id.* (concluding that "this case is riddled with contingents and speculation that impede judicial review"). "The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been finalized and its effects felt in concrete ways by the challenging parties." *Cement Kiln Recycling Coal. v. EPA*, 439 F.3d 207, 2014 (D.C. Cir. 2007) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 148-49 (1967)) (internal quotation marks omitted). In testing ripeness, a court considers both "[(1)] the fitness of the issues for judicial decision and [(2)] the hardship to the parties of withholding court consideration." *Devia v. Nuclear Regul. Comm'n*,

492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996)).

"[T]he fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Id.* (quoting *Atl. States Legal Found, Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003)). Fundamentally, however, judicial fitness turns on whether the case "depends on future events that may never come to pass, or that may not occur in the form forecasted"; if so, the cases are unripe, because "[f]ederal courts cannot – and should not – spend their scare resources on what amounts to shadow boxing." *Id.* at 424-25 (quoting *McInnis-Miesnor v. Maine Medical Ctr.*, 319 F.3d 63, 72 (1st Cir. 2003)).

Set against these standards, this case is not fit for judicial disposition. No alleged Department actions initiate any prosecutions. *See* Ex. A; Ex. B. Because they do not, Plaintiffs cannot plausibly allege that future measures would affect them (and if so, how). This is especially so because Plaintiffs have not alleged that any conduct they have or plan to engage in is even addressed by the Department's actions, which relate to threats of violence. Nor do Plaintiffs make allegations about what may come out of the coordination called for in the Memorandum, much less the impact of any possible future policies or measures that may come from those meetings. Plaintiffs' challenge is therefore not ripe for adjudication.

Moreover, with respect to whether there is "hardship to the parties of withholding court consideration," *Devia*, 492 F.3d at 427 (citation omitted), here, such claims would be "insubstantial." Plaintiffs are "not required to engage in, or to refrain from, any conduct," due to the Department's actual or alleged actions. *Id.* Nor is any hardship to them "immediate and

significant," because the Department has imposed no obligations on them. *Id.* (citation omitted) Accordingly, this case should be dismissed as unripe.

## III.    Plaintiffs Fail to State a Constitutional Claim.

Although the Court may dispose of the Amended Complaint by dismissing it for lack of jurisdiction under Rule 12(b)(1), should the Court reach the merits, it should dismiss the Amended Complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

### A.    Plaintiffs fail to state a claim that the alleged actions of the Department constitute an improper content-and viewpoint-based restriction on speech.

The heart of Plaintiffs' challenge is that the purported "AG Policy" "is a content-and viewpoint-based restriction on speech in violation of the First Amendment." Am. Compl. ¶ 109. This allegation falls short for two independent reasons. First, the alleged actions of the Department are not a restriction on speech. Second, the First Amendment does not protect the threats of violence, intimidation, or harassment that are the subject of the Memorandum and email.

"The Free Speech Clause restricts government regulation of private speech." *Pleasant Grove City v Summum*, 555 U.S. 460, 467 (2009). Accordingly, with limited exceptions, the First Amendment prohibits the government from "restrict[ing] expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). By contrast, restrictions on "nonexpressive conduct" do not implicate the First Amendment, even if those restrictions may impose "incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). The First Amendment, however, "does not regulate government speech," *Pleasant Grove City*, 555 U.S. at 467 (citation omitted). Rather, "as a general matter, when the government speaks it is entitled to promote a program, to espouse a policy, or to take a position" without implicating the

First Amendment.  *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 208 (2015).

This doctrinal dichotomy resolves this claim.  The Memorandum and email do not restrict or regulate private speech at all.  Rather, in the Memorandum (1) the federal government simply restates the law, as laid out in Supreme Court precedent, that "threats against public servants" are illegal and "run counter to our nation's core values," and (2) directs Department of Justice employees to convene meetings with local, state, Tribal, and territorial leaders for a "discussion of strategies for addressing threats" against school officials.  Ex A.  At no point in its one-page text does the Memorandum impose any restrictions on speech, and indeed, it does not regulate expressive conduct at all.  Rather, it conveys the government's "position" on threats of violence against school officials—that the law establishes such threats are illegal and improper, *Walker*, 576 U.S. at 208.  Accordingly, because there is no regulation of speech, but rather merely the government's restatement of existing law, the Memorandum does not implicate the First Amendment.  Indeed, the email does even less; it simply keeps track of threats of violence against school officials to provide FBI a "comprehensives analysis of this threat on a national level."  Ex. B.

In any event, the Memorandum encounters no First Amendment difficulty, because by its very terms it refers only to speech that is not protected by the Constitution.  The Memorandum concerns only threats of violence and intimidation, *i.e.*, "true threats."  And as the Supreme Court held in *Virginia v. Black*, 538 U.S. 343 (2003), the First Amendment "permits a State to ban a 'true threat,'" a category that includes both "threats of violence" and "intimidation."  *Id*. at 359-60 (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curium)).  Since a ban on true threats does not violate the First Amendment, and since the Memorandum only involves such

threats, the Memorandum does not implicate the First Amendment. Nor does the email, which similarly applies only to threats of violence. *See* Ex. B.

Nor, in any event, would the type of "true threat" conduct addressed in the Memorandum or email constitute impermissible content- or viewpoint-based discrimination. *See* Am. Compl. ¶¶ 108-119. In *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the Supreme Court noted that content discrimination "applies differently in the context of proscribable speech than in the area of fully protected speech." *Id.* at 387; *see also Virginia*, 538 U.S. at 361 ("[In *RAV*] we specifically stated that some types of content discrimination did not violate the First Amendment."). The government may "discriminat[e] among various instances of a class of proscribable speech," so long as it does not discriminate based upon the viewpoint of that speech. *R.A.V.*, 505 U.S. at 388. The government may, for example, "criminalize only those threats of violence that are directed against the President," but it may not "criminalize only those threats against the President that mention his policy on aid to inner cities." *RAV*, 505 U.S. at 388; *see also Virginia*, 538 U.S. at 362 (noting that "the Virginia statute [banning cross burning with the intent to intimidate] does not single out for opprobrium only that speech directed toward 'one of the specified topics,'" such as race, gender, political affiliation, etc.). Applying this principle here, the Department could not focus its resources only those true threats that were made by actors of a particular political persuasion (and has not done so). But the government could certainly focus on *school-related* threats without running afoul of *Virginia* and *RAV*. And that is exactly what the Attorney General did here: he issued a memorandum focusing on threats of violence against school administrators, board members, teachers, and staff—just as the Department has

focused on, for example, threats against election officials and airline flight crews[9]—without any distinction based on the viewpoint expressed by such threats. And the FBI followed up that Memorandum with an email calling for tracking of such threats of violence, again, without any distinction based on the viewpoint of the threatening actor(s). The First Amendment does not prohibit such actions.

### B. Plaintiffs fail to state a claim that the Department has violated their rights to equal protection.

Plaintiffs' second count alleges that the Department has violated their equal protection rights under the Fifth Amendment "[b]y targeting peaceful, private citizens . . . because of their political ideology and religious beliefs." Compl. ¶ 121; *see also id.* ¶ 123 (alleging that the AG Policy targets Plaintiffs "for adverse treatment because of their viewpoints on political and social issues"). But this claim—which appears to be best understood as a claim of differential treatment based on Plaintiffs' political views—fails to state an equal protection claim for a number of independent, dispositive reasons. Most fundamentally, Plaintiffs never plead facts adequate under *Iqbal* to show that a memorandum that concerns violence or threats of violence against school officials—without any reference to individuals, much less their political beliefs—constitutes discrimination against Plaintiffs on the basis of viewpoint. That is enough to dismiss this claim. But even assuming this fundamental objection can be overcome, Plaintiffs fail to comport with the doctrinal requisites for an equal protection allegation.

---

[9] *See, e.g.*, Justice Department Addresses Rise in Criminal Conduct on Commercial Aircraft (Nov. 24, 2021), https://www.justice.gov/opa/pr/justice-department-addresses-rise-criminal-conduct-commercial-aircraft; Justice Department Launches Task Force to Combat Threats Against Election Workers (July 29, 2021), https://www.justice.gov/opa/blog/justice-department-launches-task-force-combat-threats-against-election-workers-0.

### 1.    Plaintiffs Fail to Allege Facts Establishing Discriminatory Purpose.

"In order to establish an equal protection violation, a litigant is required to show that 'the defendant acted with discriminatory purpose,' meaning '[i]t involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Smothers v. Dist. of Columbia*, No. 19-cv-2632 (ABJ), 2020 WL 5411294, at *5 (D.D.C. Sept. 9, 2020) (quoting *Iqbal*, 556 U.S. at 676) (citation omitted); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273 (1979) ("even if a neutral law has a disproportionate adverse effect upon a [protected class], it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose").  But here, in the face of a Memorandum and email that are neutral in scope, applying to all threats of violence against school officials, not those issued by those of a particular political persuasion, Plaintiffs have not pled any facts showing that "discrimination is . . . a plausible conclusion." *Iqbal*, 556 U.S. at 682.

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009), is dispositive.  There, as here, plaintiffs alleged that a policy that allegedly had a discriminatory effect on the basis of race, religion, and/or national origin was implemented *because* of those discriminatory effects. *Id.* at 681.  The Court rejected that claim at the motion to dismiss stage.  It first held that allegations that defendants subjected plaintiffs to mistreatment on account of their protected status were "bald allegations" that were merely "formulaic recitation of the elements of a constitutional discrimination claim." *Id.* (quotations omitted); *see also id.* ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). Plaintiffs' allegations of discriminatory intent here are similarly conclusory, and should be rejected for the same reason as *Iqbal*. *See* Am. Compl. ¶ 123 ("The AG Policy is targeting Plaintiffs and

other similarly situated parents and private citizens for adverse treatment because of their viewpoints on political and social issues . . . .").

Plaintiffs plead in conclusory fashion that the Department of Justice purportedly targeted them for adverse treatment based on their viewpoints. *E.g.,* Am. Compl. ¶ 107; *see also id.* ¶ 97 ("And while the Attorney General has directed his law enforcement authority and resources to target private citizens speaking out at school board meetings, he has completely ignored a real, existential, and national criminal threat because the perpetrators of this *criminal* activity share the Attorney General's political views."). But this purported (and wholly unsupported) differential treatment is not enough: "[o]n its own, however, evidence of disparate impact will seldom support an inference of intentional discrimination," even at the motion to dismiss stage. *Bellinger v. Bowser*, No. 17-cv-2134 (TJK), 2018 WL 4705808, at *6 (D.D.C. Sept. 30, 2018). Here, Plaintiffs do nothing more than allege, in conclusory fashion, that the Attorney General has treated two groups of people differently, and add to that the bald assertion that the differential treatment reflects the Attorney General's purported political views. That is woefully insufficient to meet the "plausibility" pleading standard of *Iqbal*.

Absent any facts showing a discriminatory intent to treat groups differently *because* of their alleged group status, allegations of intentional discrimination are not "plausible." *See id.* at *6-7." (citing *Iqbal*, 556 U.S. at 679). And here, there are no such facts: Plaintiffs do not allege a pattern of discriminatory impact that is unexplainable on grounds other than political views. *See Iqbal*, 556 U.S. at 679. The failure to even plead any of these elements precludes the inference that intentional discrimination is plausible; indeed, were it otherwise, *any* purported differential effect of a facially neutral policy would be enough to get past the motion to dismiss hurdle, a conclusion that the Supreme Court roundly rejected in *Iqbal*. 556 U.S. at 678 ("Where a complaint

pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (quotation omitted). *See also Bellinger*, 2018 WL 4705808, at *7 (rejecting claim of intentional discrimination based on differential treatment of libraries in majority-white and majority-African American neighborhoods, notwithstanding pleading of facts showing differential funding and services, because even with such facts, differential purpose was not plausible).

## 2.   Failure to plead similarly situated persons.

The "Equal Protection Clause requires [the federal government] to treat similarly situated persons alike." *Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). To prevail, "the plaintiff must show that the government has treated it differently from a similarly situated party and that the government's explanation for the differing treatment 'does not satisfy the relevant level of scrutiny.'" *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215 (D.C. Cir. 2013) (quoting *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005)).   But Plaintiffs do not plead facts showing that the government's purported actions to study threats of violence against school officials here are similarly situated to its decisions as whether to criminally prosecute unrelated protestors in unrelated situations.   Such situations would involve different legal standards, different violations, different jurisdictions, and different measures of appropriate legal response.

**3. Plaintiffs fail to properly plead that the Government has made distinctions based on viewpoint, and rational basis review applies—and the Government's actions were rational.**

Further, to establish an equal protection violation, Plaintiffs must show that the "government's explanation for the differing treatment does not satisfy the relevant level of scrutiny." *Muwekma Ohlone*, 708 F.3d at 215 (quotation omitted). They cannot.

The first step is to determine the level of scrutiny. A "classification that does not burden either a fundamental right or a suspect class must be reviewed under the rational basis test." *Tucker v. Branker*, 142 F.3d 1294, 1300 (D.C. Cir. 1998). There are no allegations that Plaintiffs are a suspect class (*i.e.*, race, gender, or national-origin), nor that this case implicates the "'fundamental rights' line of equal protection jurisprudence, which requires 'heightened' scrutiny for any distinction in a law that restricts fundamental rights (such as First Amendment freedoms)." *Walsh v. Brady*, 927 F.2d 1229, 1236 (D.C. Cir. 1991) (citation omitted); *see also Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) ("When a statutory classification *significantly interferes* with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.") (emphasis added).

Plaintiffs have not pled facts establishing any distinction in the Memorandum or email that is based on viewpoint, nor that the Memorandum or email "significantly interferences" with their exercise of their fundamental rights. First, as discussed above, the Memorandum and email make no distinction regarding the viewpoint of any party; they apply to conduct in the form of true threats, regardless of the political views of the person uttering the relevant words. Nor have Plaintiffs pled facts supporting the idea that there is an implicit ideological distinction, *i.e.*, that the Attorney General issued the Memorandum or email *because* of an intent to discriminate against Plaintiffs' viewpoints. There is simply a bare assertion that this is so, *see* Am. Compl. ¶ 98—but

a bare assertion does not satisfy *Iqbal*. It is not "plausible" that viewpoint, as opposed to other standards for what actions to dedicate scarce Department resources to, justifies what Plaintiffs claim—inaccurately, *see supra* III.B.1—is any such differential treatment. *See Iqbal*, 556 U.S. at 678-79.

Nor, in any event, have Plaintiffs pled facts showing that the Memorandum or email "significantly" interferes" with their First Amendment rights such that heightened scrutiny would be applicable. The term "significantly interferes"—as is relevant for heightened scrutiny—is applied "very narrowly." *Walsh*, 927 F.2d at 1237. It applies, for example, to "absolute" restrictions, or situations where the prohibited conduct was "essential." *Walsh*, 927 F.2d at 1237. The Memorandum and email impose no restrictions on speech; much less "absolute" restrictions or the prohibition of "essential" conduct; Plaintiffs are free to advocate stridently for their preferred policy positions, including those that are against the preferences of those in power. Although the Memorandum directs Department of Justice personnel to coordinate with state, local, and Tribal authorities about threats against school officials, and the email calls for tracking of such threats, the First Amendment does not protect such threatening conduct, and therefore fundamental rights are simply not in play. *See M.K. v. Tenet*, 99 F. Supp. 2d 12, 31 (D.D.C. 2000) (there can be no violation of equal protection based on a fundamental right to First Amendment when "the plaintiffs have stated no violation of their First Amendment rights"). Thus, even assuming that it makes any sort of classification, the Memorandum and email do not implicate Plaintiffs' First Amendment rights, much less "significantly interfere" with those rights. This case therefore calls for rational-basis scrutiny.

Viewed through this lens of scrutiny, it is obvious that Plaintiffs' claims are meritless. "[R]eview of an equal protection claim in the context of agency action is similar to that under the

APA." *Cooper Hospital/University Med. Ctr. v. Burwell*, 179 F. Supp. 3d 31, 47 (D.D.C. 2016) (quoting *Nazareth Hosp. v. Sec'y, U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 180 (3d Cir. 2014)), *aff'd sub nom. Cooper Hosp. Univ. Med. Ctr. v. Price*, 688 F. App'x 11 (D.C. Cir. 2017).   When, as here, no suspect class is involved, the only question is whether the action was "rational (*i.e.*, not arbitrary and capricious)." *Id.* Here, given the importance of public education, it is entirely appropriate for the Department to focus its efforts on ensuring a safe environment for all involved, irrespective of how it is separately addressing other individuals or groups in other settings.   And, given the multiple levels of government involved in education in this country, it was equally appropriate for the federal government to do so in coordination with various state, local, Tribal, and territorial officials.   The Equal Protection Clause is not implicated by this sensible, partnership-based approach to an emergent issue.   In the event Equal Protection is implicated at all, its mandates are more than satisfied here.

### C. The Memorandum and email violate no parental rights.

The third count of Plaintiffs' Amended Complaint is that the Department's alleged actions "unreasonably interfere[] with the liberty of parents and guardians, including certain Plaintiffs whose children attend SAS or LCPS . . . to direct the upbringing and education of their children under their control in violation of the Fifth Amendment." Am. Compl. ¶ 127. While the Supreme Court has recognized a qualified fundamental right of "parents and guardians to direct the upbringing and education of children under their control," *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-55 (1925) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)), Plaintiffs have not adequately pled that any such right has been violated here.

First, Plaintiffs have not pled any facts explaining *how* the Department is violating their parental rights; rather, the complaint simply states that the purported "AG Policy" *is* violating

those rights.  *See* Compl. ¶ 127.  But this is, at best, simply  a "[t]hreadbare recitals of the elements of a cause of action," or "conclusory  statements," which "do not suffice." *Iqbal*, 556 U.S. at 678. Indeed, stating that the Department "unreasonably  interferes with the liberty  of parents and guardians" is exactly the sort of "labels  and conclusions"  that are "devoid  of further factual enhancement"  that the Supreme Court explicitly  rejected. *Id.* (quotation omitted)

Plaintiffs  have every right to advocate for policies they believe  are appropriate for their children.   But they do not have the right to issue threats of violence  while  advocating  for such policies.  And more to the point – the Memorandum and email, which mention *nothing* about the substance of such matters, other than to note that "spirited  debate about policy matters is protected under our Constitution," Exs. A & B, certainly  do not interfere  with  any such parental rights afforded by the U.S. Constitution.   The Memorandum and email do not purport  to dictate the substance of education policy  in any jurisdiction,  nor do they address in any way parents' rights to direct their children's upbringing.   Plaintiffs  therefore fail to state a claim for violation  of parental rights.

### IV.     The Department Has Not Violated RFRA.

Finally,  Plaintiffs  claim  that  the  Department  has  violated  the  Religious  Freedom Restoration Act ("RFRA").  *See* Am. Compl.  ¶¶ 129-140.  They  have failed  to plead facts that plausibly  establish  such a violation.

RFRA  prohibits  the  federal  government  from  "substantially  burden[ing]  a person's exercise  of religion"  unless it "demonstrates  that application  of the burden to the person—(1) is in furtherance of a compelling  government interest; and (2) is the least restrictive means of furthering that compelling  government interest."  42 U.S.C. § 2000bb-1(b).  "A person who brings a challenge under RFRA  bears the initial  burden  of proving  that (1) the Government's  policy  or action

implicates her religious exercise, (2) the relevant religious exercise is grounded in a sincerely held religious belief, and (3) the policy or action substantially burdens that exercise." *Frederick Douglass Found., Inc. v. Dist. of Columbia*, 531 F. Supp. 3d 316, 342 (D.D.C. 2021) (citing *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015)). "A substantial burden exists when government action puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)); *see also Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (asking "whether the regulation at issue 'force[d plaintiffs] to engage in conduct that their religion forbids or prevents them from engaging in conduct their religion requires.'") (citing *Henderson v. Kennedy*, 253 F.3d 12, 16 (D.C. Cir. 2001)) (internal brackets and ellipses omitted). Whether there is a substantial burden on a person's religious exercise is a legal conclusion. *Kammerling*, 553 F.3d at 679.

Plaintiffs assert that their "sincerely held religious beliefs compel them to raise and educate their children in accord with their faith and to strongly oppose policies and education programs in their children's schools that are antithetical and contrary to Plaintiffs' faith." Am. Compl. ¶ 132. They further allege that "compliance with these religious beliefs is a religious exercise." *Id.* ¶ 133. But assuming for the purposes of this motion that these are in fact their religious beliefs, and they are sincerely held, Plaintiffs have not plausibly pled that such beliefs are substantially burdened.

Rather, their sole factual allegation is that "[t]he AG policy pressures Plaintiffs to significantly modify their religious behavior by forcing them to remain silent as their children are being indoctrinated by policies and education programs which violate Plaintiffs' sincerely held religious beliefs." *Id.* ¶ 135. But this allegation is unsupported by the facts. The Memorandum imposes no restrictions on Plaintiffs' ability "to strongly oppose policies and education programs

in their children's schools that are antithetical and contrary to Plaintiffs' faith," *id.* ¶ 132—indeed, it makes clear that "spirited debate" about these matters is protected. *See* Ex. A. Nor has the Department forced Plaintiffs "to remain silent." Am. Compl. ¶ 135. Just the opposite: debate, even vocal opposition to school policies is permitted and protected—all the Department has done is to reiterate that threats of violence against school officials are illegal, which is entirely consistent with governing Supreme Court precedent. Indeed, Plaintiffs repeatedly plead extensive advocacy activities, *see id.* ¶¶ 13-37, but do not plead that they can no longer conduct such activities, nor do they allege facts that would support such a prohibition.

Plaintiffs do not allege that their religious beliefs require them to engage in true threats against school officials (the subject of the Memorandum and email). *See, e.g.*, *Archdiocese of Wash v. WMATA*, 897 F.3d 314, 333 (D.C. Cir. 2018) (looking to whether plaintiffs have alleged that their religion requires the specific action prohibited by the alleged government policy).

Indeed, there is a more fundamental problem for Plaintiffs. The purported policy, at its core, is an *internal* governmental policy: the Memorandum calls for intergovernmental discussions, and the email is an internal FBI data tracking mechanism. These actions are "entirely activities of the FBI [and the Department], in which [the plaintiff] plays no role." *Kaemmerling*, 553 F.3d at 679. As such, the Memorandum and emails impose no "substantial burden" on Plaintiffs' exercise of religion. Such internal government actions do not "call for [plaintiffs] to modify [their] religious behavior in any way-it involves no action or forbearance on [their] part, nor does it otherwise interfere with any religious act in which [they] engage[]." *Id.*; *see also Salesian Soc., Province of St. Philip the Apostle, Inc. v. Mayorkas*, No. 18-cv-0477 (EGS), 2021 WL 4306150, at *17 (D.D.C. Sept. 22, 2021) (government's "categorization of the type of financial support the Salesian Society provides to the Brothers does not call for the Brothers to

modify their religious practice, including their vow of poverty, nor does it call for the Salesian Society to modify their practice of providing support for the Brothers who live out their vow of poverty"). Plaintiffs are free to engage in their strong opposition to local school board policies, as they were before any actions of the Department—they are not required to take an action, or forebear in an action (other than the criminal true threats which have always been prohibited, and which they do not allege are compelled by their religious beliefs).

In addition to not showing any burden on their religion, they have not shown that the remaining elements of a RFRA claim are satisfied. 42 U.S.C. § 2000bb-1(b)(2).

Accordingly, Plaintiffs conclusory assertions that the Government has violated RFRA do not plausibly state a claim under Rule 12.

## CONCLUSION

For the aforementioned reasons, this Court should dismiss the Amended Complaint for lack of jurisdiction and failure to state a claim.

Dated February 15, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Joseph E. Borson*
JOSEPH E. BORSON (Va. Bar No. 85519)
Trial Attorney
U. S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., NW
Washington, D.C. 20005
Tel.    (202) 514-1944
email:  joseph.borson@usdoj.gov

*Counsel for Defendant*

39