IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SALINE PARENTS, *et al.*,

        Plaintiffs,

      v.

MERRICK GARLAND,
in his official capacity as Attorney General of
the United States of America

        Defendant.

Civil Case No. 1:21-cv-2775-DLF

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

SUMMARY OF MATERIAL FACTS ....................................................................................... 2

ARGUMENT ......................................................................................................................... 11

I.      Plaintiffs Have Advanced Claims for Relief that Are Plausible on Their Face ................. 11

      A.      Standard of Review ............................................................................................ 11

      B.      Neither *Twombly* nor *Iqbal* Compels Dismissal of *this* Case ................................ 12

            1.      *Twombly* Does Not Compel Dismissal of this Case ....................................... 12

            2.      *Iqbal* Does Not Compel Dismissal of this Case............................................. 14

II.      The First Amended Complaint Alleges Plausible Causes of Action ............................... 15

      A.      The Policy Directive Is Not Immune from Constitutional Challenge .................. 15

      B.      The AG Policy Deters the Exercise of Fundamental Rights................................ 17

      C.      The AG Policy Violates RFRA............................................................................ 23

      D.      Designating Plaintiffs as Criminal "Threats" or "Domestic Terrorists" Violates Plaintiffs' Fundamental Rights ............................................................. 29

      E.      Threatening Intrusive and Coercive Investigations and Surveillance to Dissuade Political Opposition Violates Fundamental Rights ............................... 30

      F.      Targeting Plaintiffs for Adverse Treatment Based on Their Political, Religious, and Social Views Violates the Equal Protection Guarantee of the Fifth Amendment .............................................................................................. 32

      G.      The AG Policy Violates Plaintiffs' Parental Rights ............................................ 34

III.      This Court Has Jurisdiction to Hear and Decide this Case, including Granting the Requested Relief ................................................................................................................ 35

      A.      This Case Presents a "Justiciable Controversy" ................................................. 35

B.      Plaintiffs Have Asserted an "Injury-in-Fact" that Is "Fairly Traceable" to the Challenged Action and "Likely to Be Redressed by the Requested Relief" .........36

C.      Plaintiffs' Claims Are Ripe for Review ....................................................................39

D.      Plaintiffs' Claims Are Redressable: Declaratory and Injunctive Relief Are Appropriate ..........................................................................................................41

CONCLUSION ..............................................................................................................................44

CERTIFICATE OF SERVICE ......................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967)..................................................................................................39, 40

*Aetna Life Ins. Co. v. Haworth,*
300 U.S. 227 (1937)...........................................................................................................35

*Allen v. Wright,*
468 U.S. 737 (1984)......................................................................................................36, 37

*\*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)......................................................................................................12, 14

*Barenblatt v. United States,*
360 U.S. 109 (1959) ..........................................................................................................31

*Bates v. Little Rock,*
361 U.S. 516 (1960)......................................................................................................16, 23

*\*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................................12, 13, 14, 34

*Berner v. Delahanty,*
129 F.3d 20 (1st Cir. 1997)................................................................................................41

*Bible Believers v. Wayne Cnty.,*
805 F.3d 228 (6th Cir. 2015) ...........................................................................................33

*Bivens v. Six Unknown Fed. Narcotics Agents,*
403 U.S. 388 (1971)......................................................................................................14, 15

*Bowers v. Nat'l Collegiate Athletic Ass'n,*
475 F.3d 524 (3d Cir. 2007)..............................................................................................37

*Bradenburg v. Ohio,*
395 U.S. 444 (1969)...........................................................................................................20

*\*Burwell v. Hobby Lobby Stores, Inc.,*
134 S. Ct. 2751 (2014)...................................................................................................25, 26

*Cantwell v. Conn.,*
310 U.S. 296 (1940)...........................................................................................................24

*Cheffer v. Reno,*
55 F.3d 1517 (11th Cir. 1995) ...................................................................41

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993).........................................................................24, 25

*City of Boerne v. Flores,*
521 U.S. 507 (1997)..................................................................................28

*City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n,*
429 U.S. 167 (1976)..................................................................................21

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982)..................................................................................17

*Clark v. Library of Congress,*
750 F.2d 89 (D.C. Cir. 1984) .............................................................23, 31

*Collinson v. Gott,*
895 F.2d 994 (4th Cir. 1990) ....................................................................22

*Connection Distributing Co. v. Reno,*
154 F.3d 281 (6th Cir. 1998) ....................................................................22

*Cutler v. United States HHS,*
797 F.3d 1173 (D.C. Cir. 2015) ................................................................36

*DeGregory v. Att'y Gen. of N.H.,*
383 U.S. 825 (1966)..................................................................................31

*Doe v. Nat'l Bd. of Med. Exam'rs,*
199 F.3d 146 (3d Cir. 1999).......................................................................38

*Dombrowski v. Pfister,*
380 U.S. 479 (1965)............................................................................23, 40

*Elrod v. Burns,*
427 U.S. 347 (1976)..................................................................................23

*Employment Div. v. Smith,*
494 U.S. 872 (1990).................................................................23, 24, 25, 26

*Erickson v. Pardus,*
551 U.S. 89 (2007)..............................................................................12, 34

*Fed. Election Com. v. Mass. Citizens for Life, Inc.*,
479 U.S. 238 (1986)............................................................................................30

*Foretich v. United States*,
351 F.3d 1198 (D.C. Cir. 2003) .........................................................................37

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000)............................................................................................42

*Fulton v. City of Phila.*,
141 S. Ct. 1868 (2021)........................................................................................29

*\*Gibson v. Fla. Legislative Comm.*,
372 U.S. 539 (1963)......................................................................................31, 44

*Glasson v. City of Louisville*,
518 F.2d 899 (6th Cir. 1975) .............................................................................21

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006)............................................................................................29

*Gully v. NCUA Bd.*,
341 F.3d 155 (2d Cir. 2003)...............................................................................37

*Healy v. James*,
408 U.S. 169 (1972)............................................................................................22

*Hettinga v. United States*,
677 F.3d 471 (D.C. Cir. 2012) ...........................................................................11

*Holt v. Hobbs*,
135 S. Ct. 853 (2015).....................................................................................25, 27

*Hosanna-Tabor v. EEOC*,
132 S. Ct. 694 (2012)..........................................................................................25

*In re Thornburgh*,
869 F.2d 1503 (D.C. Cir. 1989) .........................................................................36

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
341 U.S. 123 (1951)............................................................................................38

*Jones v. Heyman*,
888 F.2d 1328 (11th Cir. 1989) .........................................................................22

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008) ........................................................................................27, 28

*Ky. v. Graham*,
473 U.S. 159 (1985) ...............................................................................................................15

*Laird v. Tatum*,
408 U.S. 1 (1972) ...................................................................................................................37

*Lee v. Weisman*,
505 U.S. 577 (1992) ...............................................................................................................16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...............................................................................................................37

*McDaniel v. Paty*,
435 U.S. 618 (1978) ...............................................................................................................24

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) ...............................................................................................................39

*Meese v. Keene*,
481 U.S. 465 (1987) .............................................................................................29, 30, 42

*Mesa v. White*,
197 F.3d 1041 (10th Cir. 1999) .............................................................................................21

*Meyer v. Nebraska*,
262 U.S. 390 (1923) ...............................................................................................................34

*Minn. Citizens Concerned for Life v. Fed. Election Comm'n*,
113 F.3d 129 (8th Cir. 1997) .................................................................................................41

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
460 U.S. 575 (1983) ...............................................................................................................16

*NAACP v. Ala.*,
357 U.S. 449 (1958) .............................................................................................16, 22, 23, 31

*NAACP v. Button*,
371 U.S. 415 (1963) .........................................................................................................16, 18

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .........................................................................................................20, 21

*NCAA v. Governor of N.J.,*
730 F.3d 208 (3d Cir. 2013) ................................................................37

*N.H. Right to Life Political Action Comm. v. Gardner,*
99 F.3d 8 (1st Cir. 1996) ....................................................................41

*N.Y. Times v. Sullivan,*
376 U.S. 254 (1964) ............................................................................21

*Nietzke v. Williams,*
490 U.S. 319 (1989) .......................................................................13, 15

*Norton v. Ashcroft,*
298 F.3d 547 (6th Cir. 2002) ..............................................................40

*\*Parsons v. United States DOJ,*
801 F.3d 701 (6th Cir. 2015) ...........................................37, 38, 41, 42, 43

*\*Pierce v. Society of Sisters,*
268 U.S. 510 (1925) .......................................................................34, 39

*\*Police Dept. of the City of Chi. v. Mosley,*
408 U.S. 92 (1972) .........................................................................22, 32

*Price v. Socialist People's Libyan Arab Jamahiriya,*
294 F.3d 82 (D.C. Cir. 2002) ..............................................................36

*\*Presbyterian Church v. United States,*
870 F.2d 518 (9th Cir. 1989) .........................................................31, 32 40, 41

*Red Bluff Drive-In, Inc. v. Vance,*
648 F.2d 1020 (5th Cir. 1981) ............................................................41

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) ............................................................................23

*Rooks v. Krzewski,*
No. 306034, 2014 Mich. App. LEXIS 604 (Mich. Ct. App. Apr. 3, 2014) ...................................43

*Scheuer v. Rhodes,*
416 U.S. 232 (1974) ............................................................................13

*Sherbert v. Verner,*
374 U.S. 398 (1963) .......................................................................24, 25

*Smith v. Nixon*,
807 F.2d 197 (D.C. Cir. 1986) ................................................................43

*Socialist Workers Party v. Att'y Gen.*,
419 U.S. 1314 (1974) ..............................................................................31

*Steffel v. Thompson*,
415 U.S. 452 (1974) ................................................................................40

*Surita v. Hyde*,
665 F.3d 860 (7th Cir. 2011) ..................................................................21

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..........................................................................36, 38

*Tandon v. Newsom*,
141 S. Ct. 1294 (2021) ............................................................................28

*Thomas v. Review Bd.*,
450 U.S. 707 (1981) ....................................................................25, 26, 28

*Thomas v. Union Carbide Agric. Prod. Co.*,
473 U.S. 568 (1985) ..........................................................................39, 40

*United States v. Accra Pac, Inc.*,
173 F.3d 630 (7th Cir. 1999) ..................................................................38

*United States v. Alvarez*,
567 U.S. 709 (2012) ................................................................................18

*United States v. Lee*,
455 U.S. 252 (1982) ................................................................................25

*United States v. W. T. Grant Co.*,
345 U.S. 629 (1953) ................................................................................17

*Va. v. Black*,
538 U.S. 343 (2003) ................................................................................18

*Warth v. Seldin*,
422 U.S. 490 (1975) ..........................................................................36, 37

*Watts v. United States*,
394 U.S. 705 (1969) ..........................................................................18, 19

*Weinberger v. Wiesenfeld*,
420 U.S. 636 (1975) ................................................................................................22, 32

*Wis. v. Yoder*,
406 U.S. 205 (1972) ........................................................................................................24

**Constitutions**

U.S. Const. art. III, § 2 ..................................................................................................35

**Statutes / Rules**

*42 U.S.C. § 2000bb ........................................................................................................24

*42 U.S.C. § 2000cc ...................................................................................................24, 25

*Fed. R. Civ. P. 8 .......................................................................................12, 13, 14, 34

Fed. R. Civ. P. 12(b) ...............................................................1, 2, 11, 12, 13, 36

<u>Other</u>

https://nypost.com/2021/10/25/ag-merrick-garland-white-house-owe-americas-domestic-terrorist-parents-an-apology-and-an-explanation/ ........................................................................17

# INTRODUCTION

The Attorney General of the United States (AG) has weaponized the vast law enforcement resources of the federal government to target parents, including Plaintiffs, and other private citizens who publicly oppose the progressive and immoral agenda being forced upon their children in various school districts across the country, specifically including the school districts in Loudoun County, Virginia, and Saline, Michigan. The AG has pejoratively designated these parents and private citizens as "threats" and "domestic terrorists," deeming them worthy of investigation and surveillance by the federal government. This Orwellian policy violates Plaintiffs' fundamental rights protected by the U.S. Constitution and federal statutory law.

In his motion, the AG asks this Court to dismiss Plaintiffs' First Amended Complaint. He challenges this Court's jurisdiction to hear and decide Plaintiffs' claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. More specifically, he asserts that Plaintiffs lack standing, and even if they have standing, their claims are not ripe for review. The AG's motion also tests the legal sufficiency of Plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The AG's response to the First Amended Complaint, by way of his motion to dismiss, is in large measure an argument about which alleged facts this Court should ignore or dismiss and which reasonable inferences, among competing inferences, this Court should draw. In other words, the AG invites the Court to ignore the relevant procedural standards governing the current motion. This invitation is patently improper. Indeed, the AG wants this Court to treat the alleged facts (and only certain alleged facts, as he ignores others) as individual allegations that don't fit together as a mosaic. Thus, as the AG presents his version of the facts to this Court, he addresses each one separately, ignores or rewrites them when they are inconvenient, inserts facts that do

not exist, and downplays each fact separately and out of context.  In this way, the AG asks the Court to look at each tile separately and to ignore the mosaic they create.  This is an invitation for error.  The facts, taken together, present a "plausible" narrative of a rogue policy designed to intimidate and silence parent protestors at school board meetings, including Plaintiffs.  And while the AG may be operating on facts in a parallel universe, the Court must decide this motion as set forth in the universe of facts provided by Plaintiffs.  Accordingly, Plaintiffs urge the Court to follow the legal standards applicable to a motion to dismiss—accepting all the factual allegations as true and drawing *all* reasonable inferences in favor of Plaintiffs' claims.  We believe that if this exercise is carried out with a detached objectivity, the Court will deny the AG's motion.

While jurisdiction is a threshold issue that must be resolved before reaching the merits on any claim, Plaintiffs will first address the AG's arguments under Rule 12(b)(6) since these arguments will further demonstrate and establish the appropriate context (the mosaic) for why this Court has jurisdiction to resolve this case.  Before turning to the AG's arguments under Rule 12(b)(6), we will summarize the material facts set forth in the First Amended Complaint.

## SUMMARY OF MATERIAL FACTS[1]

Plaintiffs are parents and concerned citizens who strongly and publicly object to and oppose the divisive, false, harmful, immoral, and racist curricula and policies proposed and/or adopted and implemented by their local school boards (Loudoun County Public Schools, Virginia and Saline Area Schools, Michigan), specifically including, but not limited to, the school boards' transgender policies, pornographic sexual education curricula, and Critical Race Theory (CRT)

---

[1] For purposes of deciding this motion, the facts are those set forth in the First Amended Complaint. (First Am. Compl., Doc. No. 8) (FAC).

indoctrination and training, which trains children to be racist.  These curricula and policies are largely favored by "progressives" on the Left, including the AG and the Biden administration for which the AG works, and they are opposed by Plaintiffs and other parents and citizens whose tax dollars are used to fund these school districts.  (FAC ¶¶ 9-67, 73-75, 81, 93-95, 100-103).

Plaintiffs' sincerely held religious beliefs compel them to raise and educate their children in accord with their faith and to strongly oppose policies and education programs in their children's schools that are antithetical and contrary to Plaintiffs' faith, including CRT, immoral sex education curricula, and the transgender policies.  Plaintiffs' compliance with these religious beliefs is a religious exercise.  Plaintiffs and other concerned parents and private citizens rightfully object to the implementation of such harmful and immoral policies and programs in their public schools. And these parents and citizens, including Plaintiffs, rightfully express their outrage and objections to these programs during school board meetings—meetings which are open to the public and open for public comment—and in other public forums.  (FAC ¶¶ 44-46, 50, 64).

Progressives, such as the AG, do not believe that it is the parents' right to determine and direct the care, teaching, and education of their children.  (FAC ¶¶ 47-49).

Contrary to the AG's false assertion (an assertion that he used as the pretext for announcing and implementing the AG Policy), there is no widespread criminality at school board meetings where parents and concerned citizens have expressed their opposition and outrage to the "progressive" agenda being forced upon their children in the public schools.  There is no widespread threat of criminal violence at these meetings.  Instead, these meetings involve private citizens expressing their opposition to harmful policies being considered by government officials. These meetings involve private citizens petitioning their government officials for a redress of grievances, as is their right to do under the First Amendment.  Yet, the AG considers those parents

and private citizens, including Plaintiffs, who appear at school board meetings to oppose "progressive" curricula and policies to be domestic terrorists and criminals engaging in "harassment," "threats," and "intimidation" based on their speech.  The AG Policy is aimed directly at these parents and private citizens, and its goal is to silence them.  (FAC ¶¶ 65, 66).

The AG does not consider those parents and private citizens who appear at school board meetings to support "progressive" curricula and policies to be domestic terrorists or criminals engaging in "harassment," "intimidation," or "threats" based on their speech.  In short, the AG Policy is based on ideology.  (FAC ¶ 67).

In furtherance of his policy to silence opposition to the "progressive" agenda advanced at school board meetings across the country (the AG Policy), on October 4, 2021, and with much fanfare, the AG publicly issued a memorandum that was intentionally designed (its intended purpose and effect) to chill parents and other private citizens, including Plaintiffs, from publicly expressing their opposition to the "progressive" agenda being implemented by government officials in the public schools.  The AG's objective for issuing this memorandum was to silence such expression.  This memorandum is just one component of the AG Policy, but it is direct evidence of the existence of the challenged policy.  (FAC ¶¶ 68-69).

In his October 4 "Memorandum For" the Director of the Federal Bureau of Investigation (FBI), the Director for the Executive Office for U.S. Attorneys, the Assistant Attorney General of the Criminal Division, and all United States Attorneys (all of whom are responsible for investigating and prosecuting criminal activity), the AG falsely states that "there has been a disturbing spike in harassment, intimidation and threats of violence against school administrators, board members, teachers, and staff who participate in the vital work of running our nation's public schools."  In his memorandum, the AG gives a meaningless nod to the Constitution, stating, "While

spirited debate about policy matters is protected under our Constitution, that protection does not extend to threats of violence or efforts to intimidate individuals based on their views."  Yet, the memorandum is, in fact, a heavy-handed, direct threat by a powerful government agency designed and intended "to intimidate individuals based on their views."  (FAC ¶ 70).

The memorandum states that the Department of Justice (DOJ) "is committed to using its authority and resources to discourage these threats . . . and other forms of intimidation and harassment."  The memorandum creates a "snitch line," by "open[ing] dedicated lines of communication for threat reporting, assessment, and response."  In short, the memorandum is a direct threat and warning to parents and private citizens across the United States, including Plaintiffs, that the DOJ and its FBI will be investigating you and monitoring what you say at these school board meetings so be careful about what you say and how you say it, thereby chilling such expression.  (FAC ¶ 71).

The October 4 memorandum is a one-page screed that rubber-stamps the claims of "progressive," left-wing activists.  It fails to address the DOJ's lack of jurisdiction to intrude on interactions between parents and local school boards in the absence of any federal crime, and it fails to account for the fact that the First Amendment protects political dissent—even dissent that rises to the level of harassment or intimidation.  (FAC ¶ 72).

The AG Policy *is the direct result of collusion* between the Biden administration and the "progressive" National School Boards Association (NSBA), which submitted a letter to the White House *on which the AG relied in creating the AG Policy and issuing the October 4 memorandum*. In fact, the Biden administration, which includes the AG, *orchestrated the creation of this letter in order to develop and adopt the AG Policy*.  (FAC ¶ 73).

The October 4 memorandum was not issued in a vacuum.  Context matters.  And the context demonstrates that it was issued as part of the larger AG Policy to silence public opposition to the adoption and promotion by school boards of "progressive" policies and curricula—the very policies and curricula that Plaintiffs strongly, and publicly, oppose.  Thus, Plaintiffs are the very targets of the AG Policy.  (FAC ¶ 74).

The Biden administration recruited "progressive" operatives of the NSBA to collaborate on the NSBA letter, which was then sent to the president.  Almost immediately following the receipt of the NSBA letter, the AG issued his October 4 memorandum that directed the FBI and U.S. attorneys' offices to conduct investigations of parents, including Plaintiffs, who challenge "progressive" school board curricula and policies—investigations the federal government has no business or jurisdiction conducting.  (FAC ¶ 75).

The NSBA letter was the *sole basis* for the AG Policy and for the issuance of the October 4 memorandum.  The NSBA letter was drafted *in cooperation and conjunction* with the Biden administration in order *to create the pretext for the AG Policy*.  (FAC ¶¶ 76-77).

The claim that there is an unusual surge of violence against school administrators—the asserted basis for the AG Policy—is false, and the AG knows it is false.  (FAC ¶ 78).

The AG Policy pejoratively labels parents (including Plaintiffs) who oppose the "progressive" agenda in their public schools as domestic terrorists.  (FAC ¶ 79).

As the AG acknowledges in his brief,

The apparent basis for Plaintiffs' "domestic terrorist" allegation is a September 29, 2021 letter from the National School Boards Association ("NSBA") to President Biden, in which the NSBA requested assistance from federal law enforcement regarding threats of violence against school officials.  *See* Am. Compl. ¶¶ 93-94 (referencing NSBA letter); Ltr. from Viola M. Garcia & Chip Slaven to Joseph R. Biden, Jr (Sept. 29, 2021) [hereinafter "NSBA Ltr."].  That letter stated, *inter alia*, that "[a]s these acts of malice, violence, and threats against public school officials

have increased, the *classification* of these heinous actions could be equivalent to a form of *domestic terrorism* and hate crimes."  NSBA Ltr. at 2.

(AG Br. at 13-14) (emphasis added).  Indeed, this designation as "domestic terrorism" was an important part of the *collaboration* between the Biden administration/AG and the NSBA—collaboration which directly resulted in, and served as the pretext for, the AG Policy—because the "domestic terrorism" classification was the jurisdictional hook for the AG to employ his vast federal law enforcement resources.  The AG has no jurisdiction to interfere with local school board matters, as he is doing here.  There is no general federal police power (which is why the "domestic terrorism" designation is central to the AG's actions).  (FAC ¶ 98).

The AG and the AG Policy have now given the government's imprimatur to and endorsement of the "domestic terrorist" designation and label for concerned parents and private citizens, including Plaintiffs, who publicly express their opposition and outrage to "progressive" school board curricula and policies being imposed upon their children by government officials in our nation's public schools.  (FAC ¶ 94).

Pursuant to the AG Policy and as part of its implementation, the FBI created a "threat tag" to aid in tracking and investigating parents, including Plaintiffs, who the AG and his "progressive" allies consider a threat to school board officials.  This "threat tag" causes further reputational harm and injury, and *it reinforces* the injurious "domestic terrorist" label promoted by the AG Policy. (FAC ¶ 84).

Pursuant to and in furtherance of the AG Policy, an October 20, 2021, internal email from the FBI's criminal and counterterrorism divisions instructed agents to apply the threat tag "EDUOFFICIALS" to all investigations and assessments of alleged "threats" directed specifically at education officials.  (FAC ¶ 85).

Pursuant to the October 20, 2021 email, "The purpose of the threat tag is to help scope this threat on a national level, and provide an opportunity for comprehensive analysis of the threat picture for effective engagement with law enforcement partners at all levels." The email also directs FBI agents to consider whether the activity being investigated violates federal law and what the potential "motivation" is behind it, demonstrating that the government will consider the viewpoints (*i.e.*, "motivation") of those it is investigating as part of the AG Policy. (FAC ¶ 86).

Through the AG Policy, the AG and his DOJ seek to intimidate parents, including Plaintiffs, by overtly announcing that the FBI and federal prosecutors would be dispatched to conduct investigations of parents for speaking out at school board meetings and in other free speech forums. (FAC ¶ 80).

The AG, in cooperation with the White House, is scheming to appease the hard-left "progressive" base by publicly floating the claim that parents could find themselves under federal investigation for engaging in political dissent. The intended message is clear: parental threats to take *legitimate action* against school boards will be interpreted by the AG and his DOJ as violent criminal threats. (FAC ¶ 81).

What the AG is doing through the AG Policy is using legal processes punitively against his and the White House's political opposition. (FAC ¶ 82).

When the Attorney General of the United States warns that he is going to do something that he is not allowed to do under the U.S. Constitution it changes the facts on the ground. It paralyzes and thus chills the exercise of fundamental rights—which are rights because they are supposed to be immune from such government abuse. Threats of investigations, like investigations themselves, have a chilling effect on the rights to freedom of speech and religious exercise. The AG knows it, and that is the intended purpose and effect driving the AG Policy. (FAC ¶ 83).

Because of the AG Policy, public school boards and school officials know that they can now chill and indeed silence the speech of the opposition by claiming that it is "harassing" or "intimidating," or "threatening." In this respect, the AG Policy empowers a "heckler's veto" on the speech of parents and concerned private citizens, including Plaintiffs, with which government officials disagree. (FAC ¶ 95).

In his October 4 memorandum, the AG expressly mentions the FBI as a further tool of intimidation. Conducting investigations and surveillance, which is what the FBI does, on private citizens because of their dissident political views is prohibited by our Constitution. The Supreme Court has repeatedly acknowledged the constitutional infirmities associated with government surveillance and investigations that threaten to dampen the exercise of First Amendment rights. Investigation is a part of lawmaking and the First and Fifth Amendments stand as barriers to state intrusion of privacy. Accordingly, we deal here with the authority of the federal government to investigate people, their ideas, and their activities based on their political and religious views. When the government, state or federal, is prohibited from dealing with a subject, it has no constitutional privilege to investigate it. Thus, the Supreme Court has long recognized the dangers inherent in investigative activity that threatens to dampen the exercise of First Amendment rights, such as the AG Policy. (FAC ¶ 96).

Many parents and private citizens who share Plaintiffs' views consider the AG Policy "shocking." They are frightened and intimidated by the actions of the AG. They believe that they are living in a time when they cannot speak up for their children and stand up for what is right, moral, and just in America. The AG Policy is having its intended effect: it is chilling the speech of private citizens, including Plaintiffs. (FAC ¶ 99).

The AG has a family financial conflict of interest as he directs the FBI to investigate parents and other private citizens who are protesting against the use of public schools to indoctrinate children in CRT and other "progressive" Left dogma.  The conflict stems from the fact that the AG's son-in-law, Alexander "Xan" Tanner, the co-founder and president of Panorama Education, has a lucrative business promoting some of the objectional indoctrination materials—materials purchased by public school districts throughout the country.  It is reported that "Panorama pushes race-focused surveys and conducts trainings on systemic oppression, white supremacy, unconscious bias, and intersectionality — all under the rubric of 'Social-Emotional Learning [(SEL)].'"  Some of the relevant indoctrination materials include "SEL as Social Justice — Dismantling White Supremacism Within Systems and Self."  (FAC ¶ 100).

Thus, the AG *is personally and ideologically vested* in silencing opposition to CRT and other "progressive" curricula and policies promoted by local school boards, and he is directing the power and resources of the DOJ to do just that via the AG Policy.  Accordingly, the AG, through the AG Policy, is discriminating on the basis of ideology.  Consequently, the AG created and adopted the AG Policy with a specific intent to discriminate against Plaintiffs' ideological views. (FAC ¶¶ 101-03).

Parents and private citizens, including Plaintiffs, should not have to choose between defending their children by publicly opposing the implementation of the "progressive" agenda in their public schools or being subjected to government investigation, surveillance, punishment, and pejorative labelling.  (FAC ¶ 104).

Since the announcement of the AG Policy, there has been at least one report of the presence of federal agents at a local school board meeting in Virginia.[2]  (FAC ¶ 87).

---

[2] On or about October 21, 2021, and pursuant to the AG Policy, federal agents in marked and

The AG Policy has caused, and will continue to cause, irreparable harm to Plaintiffs and scores of other law-abiding citizens who want to speak in defense of their children and against the divisive, harmful, immoral, destructive, and racist agenda of the "progressive" Left.  (FAC ¶ 106).

In sum, all of the Plaintiffs want to express their opposition to and challenge their local school board policies which Plaintiffs find harmful and immoral, as is their right under the First Amendment.  Plaintiffs' sincerely held religious beliefs compel them to raise and educate their children in accord with their faith and to strongly oppose such policies and education programs in their children's schools.  Plaintiffs' compliance with these religious beliefs is a religious exercise.  Accordingly, all of the Plaintiffs want to engage in a course of conduct this is affected with a constitutional interest, and the AG Policy suppresses this conduct and puts substantial pressure on Plaintiffs' religious beliefs by treating their conduct as "harassment," "intimidation," "threats," and a form of domestic terrorism.  As a result, the AG Policy subjects Plaintiffs to punitive measures (investigations, pejorative labeling, surveillance, becoming part of government criminal records) for exercising their fundamental rights, thereby chilling the exercise of those rights.

## ARGUMENT

### I.    Plaintiffs Have Advanced Claims for Relief that Are Plausible on Their Face.

#### A.    Standard of Review.

"In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotations and citation omitted).

---

unmarked vehicles were present at a school board meeting held in Fairfax, Virginia, causing further fear, intimidation, and a chilling effect on the free speech rights of parents and other concerned citizens, including Plaintiffs.  (FAC ¶ 87).

### B.   Neither *Twombly* nor *Iqbal* Compels Dismissal of *this* Case.

In his motion, the AG relies principally on *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), but this reliance is unavailing.   These cases, individually or in combination, do not bury every constitutional violation that comes their way. And more fundamentally, they do not create a "heightened" pleading standard under the Federal Rules since that "can only be accomplished by the process of amending the Federal Rules, and not by judicial interpretation." *Twombly*, 550 U.S. at 569, n.14 (internal quotations omitted).   Indeed, the Court in *Twombly* stated, "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

In *Erickson v. Pardus*, 551 U.S. 89 (2007), a case decided shortly after *Twombly*, the Supreme Court reversed a dismissal granted under Rule 12(b)(6).   In doing so, the Court reemphasized the liberal Rule 8 pleading standard, which "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id*. at 93.   Furthermore, the Court stated, "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).   Upon application of this standard, the Court held that it was error for the Court of Appeals to determine that the allegations were "too conclusory" for pleading purposes. *Id*. at 94.

In sum, the liberal Rule 8 pleading standard described in *Erickson* is the standard that governs in this case.   Fed. R. Civ. P. 8.

### 1.   *Twombly* Does Not Compel Dismissal of this Case.

*Twombly* presented "the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act." *Twombly*, 550 U.S. at 554-55.   Thus, in the context of a Rule 12(b)(6) motion to dismiss, the Court was deciding what a plaintiff must plead to properly

state a claim under the Sherman Act's restraint of trade provision. In doing so, the Court reemphasized the liberal Rule 8 pleading standard and noted that while a complaint challenged under Rule 12(b)(6)

> does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Twombly,* 550 U.S. at 555 (internal punctuation and citations omitted). The Court cited with approval *Nietzke v. Williams*, 490 U.S. 319, 327 (1989), which stated that "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," and *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), which stated that a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely."

As the Court noted in *Twombly*, stating a claim under the restraint of trade provision of the Sherman Act requires a complaint with enough factual matter, taken as true, to suggest that an *agreement* was made. *Twombly,* 550 U.S. at 556. An allegation of parallel business conduct and a bald assertion of conspiracy are not sufficient to state a claim under this provision of the Act. *Id*. The Court observed that parallel business conduct, without more, does not suggest a conspiracy, and a conclusory allegation of agreement at some unidentified point in time does not supply facts adequate to show illegality. *Id*. at 556-57.

Needless to say, Plaintiffs have not advanced a restraint of trade claim under the Sherman Act, nor have they advanced a conspiracy claim requiring some factual evidence of an agreement as an element of the cause of action. *Twombly* does not compel a dismissal of the First Amended Complaint in this case.

## 2.    *Iqbal* Does Not Compel Dismissal of this Case.

In *Iqbal*, the plaintiff sought *damages* against high-ranking officials in their *individual* capacities pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), which creates an implied private cause of action for *damages* against federal officers.  As the Court noted, "The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue."  *Iqbal,* 556 U.S. at 676.

The constitutional claim at issue in *Iqbal* was for discrimination based on the suspect classifications of race, religion, and national origin.  *Id*. at 677.  As the Court noted, in order to recover *damages* for a claim based on *invidious discrimination*, the plaintiff must plead and prove that *each* individual defendant acted with a discriminatory purpose.  *Id*. at 676-77.  The plaintiff's claim for civil *damages* against former Attorney General John Ashcroft and FBI Director Robert Mueller, however, was based on conclusory allegations devoid of any factual basis demonstrating that it was even remotely plausible that these high-ranking officials were *personally* liable for the alleged discrimination.  *Id*. at 680-84.  Consequently, the Court dismissed the complaint, stating, "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 570).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id*. at 679.  Because the plaintiff only provided conclusory allegations with no facts demonstrating that either the former Attorney General or the FBI Director, *as individuals*, acted with a discriminatory purpose, the complaint failed to meet the minimal pleading standard of Rule 8 to support a claim for *damages* against these high-ranking government officials.

Unlike *Iqbal*, Plaintiffs are not seeking to hold any government official personally liable for damages under a *Bivens* cause of action.  Rather, Plaintiffs are seeking declaratory and injunctive relief against a government official who is responsible in his *official capacity* for creating, implementing, and enforcing the challenged policy.[3]  More fundamentally, Plaintiffs do not rely on "threadbare recitals" and "mere conclusory statements" to support their claims.  Rather, the First Amended Complaint alleges many detailed and specific facts, which must be accepted as true, *along with every reasonable inference*, even if the Court or the AG do not believe them to be true.  *See Nietzke,* 490 U.S. at 327.

In the final analysis, the First Amended Complaint sets forth sufficient facts to give the AG fair notice of what the claims are and the grounds upon which they rest, as required by the Federal Rules.  In short, Plaintiffs have advanced claims to relief that are plausible on their face.  We turn now to the substantive claims.

## II.     The First Amended Complaint Alleges Plausible Causes of Action.

### A.      The Policy Directive Is Not Immune from Constitutional Challenge.

To begin, the AG policy directive, as set forth in the First Amended Complaint (and not as parsed by the AG as just the October 4th memorandum or FBI email—the memorandum and email are evidence of the *existence* of the broader policy directive), involves an official government act that is subject to constitutional challenge.  As stated in the First Amended Complaint:

> The October 4 memorandum was not issued in a vacuum.  Context matters.  And the context demonstrates that it was issued as part of the larger AG Policy to silence public opposition to the adoption and promotion by school boards of 'progressive' policies and curricula—the very policies and curricula that Plaintiffs strongly, and publicly, oppose.  Thus, Plaintiffs are the very targets of the AG Policy.

---

[3] A suit against a government official in his or her official capacity is essentially a suit against the government.  *Ky. v. Graham*, 473 U.S. 159, 166 (1985).

(FAC ¶ 74).

Indeed, the AG Policy is "a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed" the policy.  *See Lee v. Weisman*, 505 U.S. 577, 587 (1992) (holding that a school official's decision to permit a member of the clergy to give an invocation and benediction at the school's graduation ceremony was "a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur").

For official acts that infringe First Amendment liberties, the Supreme Court has "long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment."  *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 592 (1983).  "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference."  *Bates v. Little Rock*, 361 U.S. 516, 523 (1960); *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) (stating that First Amendment "freedoms are delicate and vulnerable, as well as supremely precious in our society," and "[b]ecause [these] freedoms need breathing space to survive, government may regulate in the area only with narrow specificity").  As the Court stated in *NAACP v. Alabama*, 357 U.S. 449, 460-61 (1958), "[S]tate action which *may have the effect* of curtailing the freedom to associate is subject to the closest scrutiny."  (emphasis added).  Indeed, using the power and authority of the DOJ to pejoratively label, investigate, and conduct surveillance on law-abiding citizens, such as Plaintiffs, solely because of their dissident political views does not promote a legitimate interest of government, and it has the calculated *and intended* effect of suppressing constitutional freedoms in violation of the First Amendment.  *Cf. NAACP v. Ala.*, 357 U.S. at 461 ("In the domain of these indispensable liberties, whether of speech, press, or

association, the decisions of this Court recognize that abridgment of such rights, *even though unintended*, may inevitably follow from varied forms of governmental action.") (emphasis added).

**B.      The AG Policy Deters the Exercise of Fundamental Rights.**

The AG is playing fast and loose with the law and facts in a transparent effort to justify what the public knows is an egregious and unjustifiable policy decision that targets and labels complaining parents such as Plaintiffs as "domestic terrorists."[4]   Nowhere in the documents cited in the First Amended Complaint does the AG limit his scope of the DOJ's investigation of these parents to "true threats."   Indeed, "true threats" does not appear anywhere in the documents; yet, it appears _over twenty times_ in the AG's brief in support of his motion.   (*See generally* AG Br.). The AG no doubt realizes this problem.   But he cannot now present a separate set of facts to this Court to avoid liability.   The AG's entire motion collapses as a result.   The foundation of his argument to dismiss this case is that his policy only targets "true threats"—and this foundation is demonstrably false.

---

[4] *See, e.g.,* N.Y. Post, "AG Merrick Garland, White House owe America's 'domestic terrorist' parents an apology AND an explanation" (Oct. 25, 2021) ("Garland himself told Congress that no 'body of evidence' shows any uptick in violence at school board meetings.  (Other than the dad arrested because he rightly lost it when the Loudoun County board tried to cover up his daughter's rape.)  With the [NSBA] letter withdrawn, the AG is obliged to retract his public statement implying that dissenting parents should shut up or the feds might come calling.") (available at https://nypost.com/2021/10/25/ag-merrick-garland-white-house-owe-americas-domestic-terrorist-parents-an-apology-and-an-explanation/) (last visited on Feb. 25, 2022).  Nonetheless, even if the AG were "to retract his public statement," the bell has been rung, and the voluntary cessation of the AG's illegal conduct does not deprive this Court of its power to hear and decide this case.  As the Supreme Court noted, under circumstances such as these, not only is the AG "free to return to his old ways," *but also the public has an interest "in having the legality of the practices settled*."  *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (emphasis added); *see also City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, n. 10 (1982).  Consequently, "[a]long with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct."  *W. T. Grant Co.*, 345 U.S. at 633.

There are only a very few and limited exceptions to protected speech.[5]   Accordingly, "[p]*recision of regulation* must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. at 438 (emphasis added).   One of the limited and narrow exceptions is a "true threat," which is distinguishable from a simple "threat," or "harassment, or "intimidation."   There is <u>zero</u> evidence to support the AG's assertion that there is a widespread problem of parents making "true threats" to school officials to warrant the heavy-handed involvement of the DOJ, **and the AG knows it**.  (*See* FAC ¶ 78).   The objective of the AG Policy is <u>not</u> to suppress "true threats"—its objective is to suppress political and religious views that the AG opposes, which is why he announced this directive with such public fanfare.   As discussed further below, the speech the AG targets is fully protected by the First Amendment.

"True threats" are narrowly defined to "encompass those statements where the speaker means to communicate a *serious expression of an intent to commit an act of unlawful violence* to a particular individual or group of individuals." *Va. v. Black*, 538 U.S. 343, 359 (2003) (emphasis added).   As noted, the AG Policy is not focused on investigating "true threats"—it is focused on targeting certain political and religious viewpoints that are protected by the First Amendment.

In *Watts v. United States*, 394 U.S. 705, 708 (1969), the Supreme Court instructed that only a contextually *credible* threat to kill, injure, or kidnap the President constitutes a "true threat" that is punishable under the law.   By contrast, communications which convey political hyperbole (even if they mention weapons, such as guns or bombs) are protected by the First Amendment and do

---

[5] *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) (describing "the few historic and traditional categories of expression long familiar to the bar" that may be restricted, stating, "[a]mong these categories are advocacy intended, and likely, to incite imminent lawless action, obscenity, defamation, speech integral to criminal conduct, so-called 'fighting words,' child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent") (internal punctuation, quotations, and citations omitted).

not constitute a "true threat." *Watts*, 394 U.S. at 707-08.  Thus, the Court instructed that Watt's alleged "threat," in its factual context (*i.e.*, Watts was engaging in a political protest, not unlike the fact that the parents, including Plaintiffs, who are the targets of the AG Policy, are also engaging in a protest against objectionable school board policies) was not a "true threat" which could be constitutionally prosecuted, but instead was mere "political hyperbole" immunized by the First Amendment.  *Id*. at 706-08.

> Per the Court:
>
> [w]hatever the 'willfulness requirement implies, the statute initially requires the Government to prove a true 'threat.'  We do not believe the kind of political hyperbole indulged by the petitioner fits within that statutory term.  For we must interpret the language . . . against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that *it may include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials*.

*Watts*, 394 U.S. at 708 (citations and internal quotations omitted) (emphasis added).  Applying these principles, the Court reversed the conviction for a threat based on the statement "if they ever make me carry a rifle the first man I want in my sights is L.B.J.," *Watts*, 394 U.S. at 706, because the "offense here was a kind of very crude offensive method of stating a political opposition to the President," *id*. at 708 (internal quotations omitted).  Thus, as a matter of law, the AG cannot focus the DOJ's law enforcement resources on those who engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials," which is precisely what the AG is doing here.

In *Watts*, the Court demonstrated that the principle it relied upon was not limited to political protest speech.  The decision itself reasoned by analogy to precedent decided in the context of labor disputes, observing that "[t]he language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact." *Id.* at 708 (citations omitted).

The Supreme Court's precedent over the subsequent fifty years has both solidified the principle and provided more guidance about the kind of statements that are protected speech—speech which cannot provide the grounds for criminal or civil liability (or investigation by the government).  In *Bradenburg v. Ohio*, 395 U.S. 444 (1969), decided the same year as *Watts*, the Court reversed a criminal conviction based on a film of a gathering in which speakers, some of whom wielded arms, used the words "revengence" by the "Caucasion race" and made statements and derogatory comments about "the n\*\*ger" and "the Jew."  Despite the loathsome rhetoric, the Court reversed the conviction because the statute punished "mere advocacy not distinguished from incitement to imminent lawless action."  *Id*. at 448-49.  Thus, in *Brandenburg*, the Court held that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe *advocacy of the use of force or of law violation* except where such advocacy *is directed* to inciting or producing *imminent* lawless action *and is likely to incite or produce such action*." *Id*. at 447 (emphasis added).

Over twenty years later, in *NAACP v. Clairborne Hardware Company*, 458 U.S. 886 (1982), the Court applied these same principles to threatening rhetoric employed to ensure compliance with a boycott against racial discrimination and held those statements were protected by the First Amendment.  Therefore, the statements could not serve as the grounds for civil liability.  In that case, Charles Evers told members of the community that "blacks who traded with white merchants would be answerable to him" *id.* at 900 n. 28, and they would "have their necks broken . . . ," *id*. The Court held that Evers' comments "did not transcend the bounds of protected speech set forth in *Bradenburg*."  *Id*. at 928.  As the Court put it, "[s]trong and effective extemporaneous rhetoric cannot be nicely channeled into dulcet phrases.  And an advocate must be free to stimulate [] his audience . . . .  When appeals do not incite lawless action, they must be

regarded as protected speech.  To rule otherwise would ignore the profound commitment that debate on public issues should be uninhibited, robust, and wide-open."  *Id.* (internal quotations and citations omitted).

Accordingly, the AG's argument that his policy "simply follow[s] governing Supreme Court law" (AG Br. at 22) is false.  The AG needs a lesson on the First Amendment.

Consequently, there can be no dispute in fact or law that Plaintiffs' free speech activities and associations—the very activities and associations that subject them to intrusive and coercive government action and pejorative labeling by the AG pursuant to the challenged policy directive—are protected by the Constitution.  "The right of an American citizen to criticize public officials and to advocate peacefully ideas for change is 'the central meaning of the First Amendment.'" *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 273 (1964)).  The Supreme Court "has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'  '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.'" *Claiborne Hardware Co.*, 458 U.S. at 913 (citations omitted).

Accordingly, Plaintiffs' speech at local school board meetings is fully protected by the First Amendment.  *See, e.g., City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 175 (1976) (unlawfully restricting speech at school board meetings); *Mesa v. White*, 197 F.3d 1041, 1042 (10th Cir. 1999) (reversing summary judgment in favor of defendants, county officials, on the plaintiff's First Amendment claim because they failed to show a significant government interest in prohibiting the plaintiff's speech at a public hearing and there was evidence that defendants impermissibly restricted the plaintiff's speech based on his viewpoint); *Surita v. Hyde*, 665 F.3d 860, 869 (7th Cir. 2011) ("There is no doubt that audience time during Waukegan

city council meetings constituted a designated public forum."); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) ("[T]he city commission designated their meeting a public forum when the commission intentionally opened it to the public and permitted public discourse on agenda items."); *Collinson v. Gott*, 895 F.2d 994, 1000 (4th Cir. 1990) (Phillips, J., concurring) ("Speech at public meetings called by government officials for discussion of matters of public concern is entitled to normal First Amendment protections against general restrictions or *ad hoc* parliamentary rulings by presiding officials.").

And the Fifth Amendment's equal protection guarantee prohibits the government from targeting Plaintiffs' speech at the school board meetings based on the views it expresses. *See Police Dept. of the City of Chi. v. Mosley*, 408 U.S. 92, 96 (1972) ("[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").[6]

Also "[a]mong the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition." *Healy v. James*, 408 U.S. 169, 181 (1972) (citations omitted). "Freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 295 (6th Cir. 1998) (citing *NAACP v. Ala.*, 357 U.S. at 460). "[I]mplicit in the right to engage in activities protected by the First

---

[6] The Supreme Court's "approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). Consequently, case law interpreting the Equal Protection Clause of the Fourteenth Amendment is applicable when reviewing an equal protection claim arising under the Fifth Amendment, as in this case.

Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  And "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as [the Supreme] Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly." *NAACP v. Ala.*, 357 U.S. at 460.

It cannot be gainsaid that Plaintiffs' "[f]reedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interference," *Bates*, 361 U.S. at 523, which is happening here.  Indeed, in the First Amendment context, it is well established that "[t]he threat of sanctions may deter . . . almost as potently as the actual application of sanctions." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965).  And minimal infringement upon First Amendment values constitutes irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

As the D.C. Circuit stated in *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984), "Exacting scrutiny is especially appropriate where the government action is motivated solely by an individual's lawful beliefs or associations, for government action so predicated is imbued with the potential for subtle coercion of the individual to abandon his controversial beliefs or associations."

In this case, the challenged policy directive plainly deters protected First Amendment activity in violation of the Constitution.  The AG's arguments to the contrary are wrong.

### C.     The AG Policy Violates RFRA.

Congress, through RFRA, intended to bring Free Exercise Clause jurisprudence back to the test established prior to *Employment Division v. Smith*, 494 U.S. 872 (1990).  *See, e.g.,* 42

U.S.C. § 2000bb (enacting RFRA "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened").  RFRA, which applies to any "branch, department, agency, instrumentality, and official . . . of the United States," plainly applies to the AG.  42 U.S.C. § 2000bb-2(1).

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."  42 U.S.C. § 2000bb-1(a).  RFRA protects "any exercise of religion."  *Id.* at §§ 2000bb-2(4), 2000cc-5(7)(A).  To justify a substantial burden on the free exercise of religion under RFRA, the government must demonstrate that the challenged action is "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  *Id.* at § 2000bb-1(b).  The government's burden is a heavy one.

Fundamentally, the "exercise of religion" embraces two concepts: the freedom to believe and the freedom to act.  *Cantwell v. Conn.*, 310 U.S. 296, 303 (1940); *see McDaniel v. Paty*, 435 U.S. 618, 626 (1978) ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such.").  Indeed, "[t]he principle that government may not enact laws that suppress religious belief or practice is . . . well understood."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993).

RFRA protects "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. §2000bb-2(4); 42 U.S.C. § 2000cc-5 (emphasis added).  An "exercise of religion," in turn, is any "religiously motivated conduct," which includes the "performance of (or abstention from) physical acts . . . for religious reasons."  *Employment Div.*, 494 U.S. at 875, 877.  This understanding of religious exercise has been established for at least the

past fifty years.  *See Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (describing religious exercise as "conduct prompted by religious principles").  And if there was any doubt about its scope, Congress explicitly stated that the "concept" of religious exercise must "'be construed in favor of a broad protection of religious exercise.'"  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2762 (2014) (quoting 42 U.S.C. § 2000cc-3(g)).

The Supreme Court has likewise recognized that religious exercise can take a variety of forms. In *Smith*, for example, the plaintiffs exercised their religion by ingesting hallucinogenic drugs. 494 U.S. at 874.  In *Sherbert*, the plaintiff exercised her religion by refusing to work on a particular day of the week.  374 U.S. at 399-400.  In *Church of Lukumi Babalu Aye, Inc.*, the plaintiffs exercised their religion by engaging in animal sacrifice.  508 U.S. at 524-25.  And in *Holt v. Hobbs*, 135 S. Ct. 853 (2015), "the religious exercise at issue [wa]s the growing of a beard" and the refusal to shave it.  *Id.* at 862.

Supreme Court cases also make clear that religious exercise can involve indirect actions.  In *Thomas v. Review Board*, 450 U.S. 707, 715 (1981), the plaintiff exercised his religion by refusing to "participat[e] in the production of armaments" that might be used by others in war.  In *United States v. Lee*, 455 U.S. 252, 257 (1982), the plaintiffs exercised their religion by refusing to "pay[] Social Security taxes" that they believed would "threaten" the social practice among the Amish of caring for each other without governmental assistance.  In *Hosanna-Tabor v. EEOC*, 132 S. Ct. 694, 701 (2012), the plaintiff was a school that exercised its religion by refusing to employ a teacher who had acted contrary to the tenets of its Lutheran "belief[s]."  And in *Hobby Lobby*, the plaintiffs exercised their religion by refusing to provide their employees with health insurance that, if used by employees, might "result in the destruction of an embryo."  134 S. Ct. at 2775.

Supreme Court cases have thus firmly established that all religious exercise must be treated equally.  The law cannot treat some instances of religious exercise as more important, significant, or substantial than others, because "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  *Smith*, 494 U.S. at 887.  Simply put, "the judicial process is singularly ill equipped to resolve" how important or substantial a religious practice is.  *Thomas*, 450 U.S. at 715-16.  Such matters are "not within the judicial function [or] judicial competence," because "[c]ourts are not arbiters of scriptural interpretation."  *Id.* at 716.  Accordingly, once a plaintiff draws a line between conduct that is "consistent with his religious beliefs" and conduct that is "morally objectionable," "it is not for [a court] to say that [his] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 134 S. Ct. at 2778-79.

Indeed, in *Hobby Lobby*, the government's main argument was that "the connection between what the objecting parties must do (provide [contraceptive coverage]) and the end that they find to be morally wrong (destruction of an embryo) is simply too attenuated" to support a cognizable religious objection.  134 S. Ct. at 2777.  The Supreme Court rejected that argument, noting that it "dodge[d] the question that RFRA presents" and instead sought to address a "question that the federal courts have no business addressing," namely, "whether the religious belief asserted in a RFRA case is reasonable."  *Id.* at 2778.  Just as in *Thomas* and *Lee*, the relevant point was that the plaintiffs *themselves* believed that providing the mandated coverage would wrongfully "facilitat[e] the commission of an immoral act by another."  *Id.*  For that reason, their refusal to provide that coverage was a protected exercise of religion.

Here, Plaintiffs' sincerely held religious beliefs compel them to raise and educate their children in accord with their faith and to strongly oppose policies and education programs in their children's schools that are antithetical and contrary to Plaintiffs' faith, including CRT, immoral

sex education curricula, and the transgender policies set forth in this First Amended Complaint. Plaintiffs' compliance with these religious beliefs is a religious exercise.  (FAC ¶¶ 44-45).

Having established the "religious exercise," we turn to the substantial-burden analysis.  The Supreme Court's substantial-burden analysis involves a straightforward, two-part inquiry: a court must (1) identify the religious exercise at issue (which we have), and (2) determine whether the government has placed substantial pressure—*i.e.*, a substantial burden—on the plaintiff to abandon that exercise.  *See, e.g.*, *Holt*, 135 S. Ct. at 862 (stating that the plaintiff "bore the initial burden" of (1) showing that the government policy at issue "implicates his religious exercise," and (2) showing that the "policy substantially burdened that exercise of religion").

Plaintiffs have identified the religious exercise at issue, as set forth above, and they have alleged facts demonstrating that the AG Policy places a substantial burden on that religious exercise.  As set forth in the First Amended Complaint, the AG Policy substantially pressures Plaintiffs to modify their religious behavior by using the vast law enforcement resources of the DOJ to pressure them to remain silent as their children are being indoctrinated by policies and education programs which violate Plaintiffs' sincerely held religious beliefs and which violate the way in which Plaintiffs want to educate their children pursuant to these religious beliefs.  (FAC ¶¶ 134-35).

The AG relies on *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008), to argue that his policy directive does not substantially burden Plaintiffs' religious exercise.  (AG Br. 37-38).  The AG is mistaken.  In *Kaemmerling*, the court concluded that the criminal penalty for failure to cooperate under a federal statute in the collection of a tissue, fluid, or other bodily sample on which a DNA analysis can be carried out did not substantially burden an inmate's exercise of religion when he objects *only to the collection of the DNA information from his tissue or fluid*

*sample*, a process the criminal statute does not address, and *he does not allege that his religion*

*requires him not to cooperate with collection of a fluid or tissue sample.*  Per the court:

> The extraction and storage of DNA information are entirely activities of the FBI,
> in which Kaemmerling plays no role and which occur after the BOP has taken his
> fluid or tissue sample (*to which he does not object*).  The government's extraction,
> analysis, and storage of Kaemmerling's DNA information *does not call for
> Kaemmerling to modify his religious behavior in any way*—it involves no action or
> *forbearance* on his part, *nor does it otherwise interfere with any religious act* in
> which he engages.

*Id*. at 679 (emphasis added).  As a result, the court concluded that there was no government action

that "'pressure[d] [Kaemmerling] to modify his behavior and to violate his beliefs.'"  *Id.* (quoting

*Thomas*, 450 U.S. at 718).

 *Kaemmerling* is not this case.  Here, the AG Policy employs the vast law enforcement

resources of the federal government to "pressures [Plaintiffs] to modify [their] behavior and to

violate [their] beliefs" by compelling Plaintiffs to remain silent, accept the immoral indoctrination

of their children, and thus surrender their right to direct the education of their children pursuant to

their religious beliefs.  As noted in this response, investigations and surveillance by federal law

enforcement, as well as the threat of such tactics of intimidation, place substantial pressure on a

person to modify his or her behavior.  Such governmental actions at issue here substantially burden

Plaintiffs' religious exercise.  As a result, the burden now shifts to the government to justify its

actions under strict scrutiny, which is the standard required under RFRA.

 Strict scrutiny is the "most demanding test known to constitutional law."  *City of Boerne*

*v. Flores*, 521 U.S. 507, 534 (1997); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021)

("[S]trict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly

tailored in pursuit of those interests.' . . .  That standard 'is not watered down'; it 'really means

what it says.'") (internal citation omitted).  Under strict scrutiny, "so long as the government can

achieve its interests in a manner that does not burden religion, it _must_ do so." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1881 (2021) (emphasis added).  As the AG Policy substantially burdens Plaintiffs' exercise of religion, the "burden is placed squarely on the" AG to show that his policy directive satisfies strict scrutiny.  *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 429 (2006).  The AG cannot meet that demanding standard, and he certainly cannot do so here at the pleading stage, particularly where the basis for his policy directive was purely pretextual.  (*See* FAC ¶¶ 65, 74-78).  At the end of the day, Plaintiffs have advanced a "plausible" claim for relief under RFRA.

**D.    Designating Plaintiffs as Criminal "Threats" or "Domestic Terrorists" Violates Plaintiffs' Fundamental Rights.**

By designating Plaintiffs as criminal "threats" or "domestic terrorists" on account of their religious, social, or political views, the AG has violated Plaintiffs' fundamental rights.  This principle was affirmed in *Meese v. Keene*, 481 U.S. 465 (1987).  The reasoning in *Meese* is dispositive on the issue of whether the First Amended Complaint states plausible claims for relief and on the issue of whether Plaintiffs have standing to advance their claims (*see infra*).

In *Meese*, the plaintiff, a politician, sued to prevent the government from designating as "political propaganda" certain films he was sponsoring.  The Court held that the plaintiff had standing to challenge this official designation as a violation of the First Amendment because the plaintiff's showing of the films would cause injury to his reputation.  *Id*.  However, because the Court believed that the term "political propaganda" was "neutral," "evenhanded," and without any "pejorative connotation," it concluded that the act placed "no burden on protected expression" and was thus constitutional.  *Id*. at 480.  Consequently, it logically follows that had the Court determined that this official designation was _not_ "neutral," "evenhanded," or without any "pejorative connotation," then a constitutional violation would have occurred.  As the dissent

points out, when the government places pejorative labels on speech, "[i]t places the power of the Federal Government, with its authority, presumed neutrality, and assumed access to all the facts, behind an appellation *designed* to reduce the effectiveness of the speech in the eyes of the public" in violation of the First Amendment.  *Id*. at 493 (Blackmun, J., joined by Brennan, J., and Marshall, J., dissenting).

This is precisely the situation presented here.  Through the challenged policy directive, which was announced with great public fanfare in October 2021, and with the express reliance upon and official cooperation with the NASB, the AG has given the government's imprimatur to and official endorsement of the *designation of Plaintiffs* as criminal "threats" and "domestic terrorists."  Indeed, pursuant to the challenged policy directive, the FBI created specific "threat tags" for the investigations authorized by the directive.  Thus, by placing pejorative labels on Plaintiffs and their speech, the AG has "place[d] the power of the Government, with its authority, presumed neutrality, and assumed access to all the facts, behind an appellation *designed* to reduce the effectiveness of speech in the eyes of the public" in violation of the First Amendment.  *Fed. Election Com. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255 (1986) ("The fact that the statute's practical effect may be to discourage protected speech is sufficient to characterize [it] as an infringement on First Amendment activities.").  *Meese* compels the denial of the AG's motion.

### E.   Threatening Intrusive and Coercive Investigations and Surveillance to Dissuade Political Opposition Violates Fundamental Rights.

By threating intrusive and coercive investigations and surveillance of private citizens, such as Plaintiffs, on account of their dissident political views, Defendants have violated the Constitution.  The Supreme Court has repeatedly acknowledged the constitutional infirmities associated with government surveillance and investigations that threaten to dampen the exercise

of First Amendment rights.[7]  *DeGregory v. N.H. Atty. Gen.*, 383 U.S. 825, 829 (1966) ("Investigation is a part of lawmaking and the First Amendment, as well as the Fifth, stands as a barrier to state intrusion of privacy."); *Gibson v. Fla. Legislative Comm.*, 372 U.S. 539, 560-61 (1963) ("We deal here with the authority of a State to investigate people, their ideas, their activities. . . .  When the State or Federal Government is prohibited from dealing with a subject, it has no constitutional privilege to investigate it.") (Douglas, J., concurring); *NAACP v. Ala.*, 357 U.S. 449; *Barenblatt v. United States*, 360 U.S. 109, 126 (1959) ("The provisions of the First Amendment . . . of course reach and limit . . . investigations."); *Socialist Workers Party v. Att'y Gen.*, 419 U.S. 1314, 1319 (1974) (noting the dangers inherent in investigative activity that "threatens to dampen the exercise of First Amendment rights"); *Clark*, 750 F.2d 89 (applying strict scrutiny in a case challenging the federal government's investigation into an employee's political beliefs and associations).

In *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), for example, the plaintiff churches brought an action against the federal government and some of its officers for violating their First and Fourth Amendment rights by conducting covert surveillance on members of their congregations.  The Ninth Circuit allowed the case to proceed, stating, in relevant part:

> When congregants are chilled from participating in worship activities, when they refuse to attend church services because *they fear the government is spying on them and taping their every utterance*, all as alleged in the complaint, we think a church suffers organizational injury because its ability to carry out its ministries has been impaired. . . .  *A judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could freely participate in the services without having their religious expression being recorded by the government and becoming part of official records.*

---

[7] Threats of investigation and surveillance plainly trigger First Amendment protections.  (*See supra*).  As the AG admits, the DOJ "is committed to using *its authority and resources* to *discourage* these threats [by Plaintiffs], identify them when they occur, and prosecute them when appropriate." (AG Br. at 6) (emphasis added).

*Id.* at 522-23 (emphasis added).

Because Plaintiffs and those with whom they associate are inhibited from participating in their First Amendment activities because "they fear the government is spying on them and taping their every utterance," Plaintiffs' fundamental rights have been violated.

Indeed, the AG made clear that the DOJ would be surveilling and collecting information for an official database of parents and other private citizens that engage in speech activity at local school board meetings if the speech is found objectionable by the government. (*See, e.g.,* FAC ¶¶ 84-86 [creating a specific "threat tag" for tracking and investigations]). Thus, "[a] judicial determination" that the AG's policy directive violates the First Amendment "would reassure" Plaintiffs and those who associate with them "that they could freely participate in" their constitutionally protected activity without "being recorded [or surveilled] by the government and becoming part of official records." 870 F.2d at 522-23.

### F.   Targeting Plaintiffs for Adverse Treatment Based on Their Political, Religious, and Social Views Violates the Equal Protection Guarantee of the Fifth Amendment.

The principle of law applicable here was articulated in *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), where the Court stated, "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Weinberger*, 420 U.S. at 638 (noting that the approach to resolving Fifth Amendment equal protection claims is the same as resolving equal protection claims under the Fourteenth Amendment). Thus, when a government official targets individuals or groups for disparate treatment based on their political, religious, or social views, as the AG has done here, his

actions violate the equal protection guarantee of the Fifth Amendment in addition to the First Amendment.

Moreover, because the AG's disparate treatment of Plaintiffs (pejoratively branding them as criminals and targeting them for investigation, surveillance, and data collection) burdens their fundamental rights as set forth in the First Amended Complaint, the AG has violated the First and Fifth Amendments. *See Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 256 (6th Cir. 2015) (stating that to advance an equal protection claim, a plaintiff must allege disparate treatment that burdens a fundamental right, such as freedom of speech).

The AG asserts, contrary to the FAC, that there are no allegations evidencing a discriminatory purpose on his part or that he targeted Plaintiffs on the basis of their political and religious viewpoints.  (AG Br. at 29-32).  The AG is wrong.  He is ignoring the context of the pleadings (the mosaic) and focusing on some allegations (specific tiles in the mosaic), while completely ignoring others that undermine his claims.  For example, as alleged in the First Amended Complaint, the AG has a family financial conflict of interest as he directs the FBI to investigate parents and other private citizens who are protesting against the use of public schools to indoctrinate children in CRT and other "progressive" dogma.  The conflict stems from the fact that the AG's son-in-law has a lucrative business promoting some of the objectional indoctrination materials—materials purchased by public school districts throughout the country.  The AG is personally and ideologically vested in silencing opposition to CRT and other "progressive" curricula and policies promoted by local school boards, and he is directing the power and resources of the DOJ to do just that via the AG Policy.  The AG created and adopted the AG Policy with a specific intent to discriminate against Plaintiffs' ideological views—views which the AG opposes.

(*See* FAC ¶¶ 101-03; *see also id.* ¶¶ 47-49, 67, 68).  Plaintiffs have advanced a plausible violation of their right to equal protection.

**G.      The AG Policy Violates Plaintiffs' Parental Rights.**

In his motion to dismiss, the AG states, "While the Supreme Court has recognized a qualified fundamental right of 'parents and guardians to direct the upbringing and education of children under their control,' *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-55 (1925) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)), Plaintiffs have not adequately pled that any such right has been violated here."  (AG Br. at 35).  In typical fashion, the AG acknowledges that the legal claim is legitimate, as he must, but then proceeds to either feign ignorance as to the basis for the claims (*i.e.*, apparently not knowing or failing to understand how using the vast resources of the DOJ to interfere with and suppress a parent's right "to direct the upbringing and education of children under their control," *see* entire discussion *supra*, could violate such a right) or, as he does throughout, parse the claim by focusing simply on the "Memorandum and email" devoid of all context and reasonable inferences drawn from the entire mosaic.  That is, the AG continues to focus on individual tiles so as to avoid liability.  It would be error for this Court to take such a myopic view of the pleading in this (or any other) case.  In sum, and as noted throughout, the Federal Rules of Civil Procedure "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  As required by Rule 8, the FAC provides "'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Erickson*, 551 U.S. at 93.  Upon application of the proper standard, Plaintiffs have advanced a plausible claim that the AG Policy violates their parental rights.

Having established the legal justification for the claims at issue, we now proceed to explain why Plaintiffs have standing to advance their claims.

## III.   This Court Has Jurisdiction to Hear and Decide this Case, including Granting the Requested Relief.

### A.   This Case Presents a "Justiciable Controversy."

It is axiomatic that Article III of the Constitution confines the federal courts to adjudicating actual "cases" or "controversies."  U.S. Const. art. III, § 2.  As stated by the Supreme Court:

> A justiciable controversy is . . . distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.  The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests.  It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.  Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised . . . .

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937) (citations omitted).

Here, there is nothing "hypothetical," "abstract," "academic," or "moot" about the constitutional claims advanced.  This case presents "a real and substantial controversy" between parties with "adverse legal interests," and this controversy can be resolved "through a decree of a conclusive character."  *Id*.  It will not require the Court to render "an opinion advising what the law would be upon a hypothetical state of facts."  *Id*.  In sum, it presents a "justiciable controversy" in which "the judicial function may be appropriately exercised."  *Id.*

We turn now to demonstrate Plaintiffs' standing and this Court's jurisdiction to hear and decide this case.

**B.      Plaintiffs Have Asserted an "Injury-in-Fact" that Is "Fairly Traceable" to the Challenged Action and "Likely to Be Redressed by the Requested Relief."**

"[W]here the defendant contests only the legal sufficiency of plaintiff's jurisdictional claims [as in this case], the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).   Thus, in evaluating standing at this juncture, the Court must assume that Plaintiffs (the parties asserting federal jurisdiction) are correct on the legal merits of their claims, "that a decision on the merits would be favorable and that the requested relief would be granted[.]" *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989); *Cutler v. United States HHS*, 797 F.3d 1173, 1179-80 (D.C. Cir. 2015) ("Because the district court dismissed this case at the complaint stage, [the plaintiff] need only make a plausible allegation of facts establishing each element of standing.").  With this standard in mind, we turn to the substantive law on standing.

In an effort to give meaning to Article III's "case" or "controversy" requirement, the courts have developed several justiciability doctrines, including standing.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (holding that an organization had standing to make a pre-enforcement challenge to a law that arguably infringed its political speech).   "The doctrine of standing gives meaning to these constitutional limits by identify[ing] those disputes which are appropriately resolved through the judicial process." *Id.* (internal quotations and citation omitted).

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Consequently, to invoke the jurisdiction of a federal court, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984).  While the necessary injury-in-fact

- 36 -

to confer standing is not susceptible to precise definition, it must be "distinct and palpable," *Warth*, 422 U.S. at 501, and not merely "abstract," "conjectural," or "hypothetical," *Allen*, 468 U.S. at 751.  Put another way, the injury must be both "concrete and particularized," meaning "that the injury must affect the plaintiff in a *personal* and *individual* way."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992) (emphasis added).

Here, Plaintiffs have standing for several reasons.  First, Plaintiffs' injury is not simply a "subjective" chill on speech, which distinguishes this case from *Laird v. Tatum*, 408 U.S. 1, 10-11 (1972) (holding that subjective chill, "without more," was not sufficient for standing).  Plaintiffs have alleged that the challenged policy directive, which designates Plaintiffs as criminal "threats" and "domestic terrorists," has harmed Plaintiffs' public reputation.  (*See* FAC ¶¶ 84, 116, 119, 125, 128, 140).  Consequently, under *Meese*, Plaintiffs have standing.  "As a matter of law, reputational harm is a cognizable injury in fact."  *NCAA v. Governor of N.J.*, 730 F.3d 208, 220 (3d Cir. 2013) (citing *Meese*); *Gully v. NCUA Bd.*, 341 F.3d 155, 161-62 (2d Cir. 2003) (stating that "[t]he Supreme Court has long recognized that an injury to reputation will satisfy the injury element of standing"); *see also Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 542-43 (3d Cir. 2007) (finding standing to challenge a sanction that "affect[s] [the plaintiff's] reputation"); *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003) ("Case law is clear that where reputational injury derives directly from an unexpired and un-retracted government action, that injury satisfies the requirements of Article III standing to challenge the action.").

"[W]here claims of a chilling effect are accompanied by concrete allegations of reputational harm, the plaintiff has shown injury in fact."  *Parsons v. United States DOJ*, 801 F.3d 701, 711-12 (6th Cir. 2015) (citing *Meese* and distinguishing *Laird v. Tatum*, as "rejecting argument that the plaintiffs' First Amendment rights were being 'chilled by the mere existence,

*without more*, of [the Army's] investigative and data-gathering activity'"); *see also Parsons*, 801 F.3d at 712 ("Stigmatization also constitutes an injury in fact for standing purposes.").

Thus, the "*concrete* allegations of reputation harm" in addition to the chilling effect caused by the AG's actions as set forth in the *specific* factual allegations of the First Amended Complaint are sufficient to show injury in fact and for this Court to exercise its jurisdiction to hear and decide this case.

As *Meese* makes clear, the AG's designation of Plaintiffs as criminal "threats" and "domestic terrorists" is sufficient to establish Plaintiffs' standing to advance this challenge. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139 (1951) (holding that charitable organizations designated as "Communist" by the Attorney General had standing to challenge their designations because of, *inter alia*, "damage [to] the reputation of the organizations in their respective communities"); *see also United States v. Accra Pac, Inc.*, 173 F.3d 630, 633 (7th Cir. 1999) (stating that "being put on a blacklist . . . is treated as immediately redressible harm because it diminishes (or eliminates) the opportunity to practice one's profession even if the list . . . does not impose legal obligations"); *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 153 (3d Cir. 1999) (holding that a student had standing to challenge a rule requiring that he be identified as disabled because such a label could sour the perception of him by "people who can affect his future and his livelihood").

Plaintiffs are currently targets of investigation and data collecting.  As stated by the Supreme Court, "One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury," noting that "[w]hen an individual is *subject* to such a threat, an actual arrest, prosecution, or other enforcement action is *not a prerequisite to challenging the law*." *Susan B. Anthony List*, 573 U.S. at 158 (emphasis added); *MedImmune, Inc. v. Genentech,*

*Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat.").

As the allegations in the First Amended Complaint make clear, there is no question that Plaintiffs are *subjects* of the AG's targeting of parents and private citizens for investigation and surveillance pursuant to the challenged policy directive.  *See Thomas v. Union Carbide Agric. Prod. Co.*, 473 U.S. 568, 581 (1985) ("One does not have to await the consummation of threatened injury to obtain preventive relief."); *Pierce*, 268 U.S. at 536 (same).  The standing requirement is satisfied in this case.

### C.      Plaintiffs' Claims Are Ripe for Review.

The basic rationale of the ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."  *Thomas*, 473 U.S. at 580 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  "The problem is best seen in a twofold aspect, requiring [the courts] to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs.*, 387 U.S. at 149.  We begin by discussing the hardship prong.

As *Meese, et al.,* make plain, injury to Plaintiffs has already occurred, and it will continue without relief from this Court.  Plaintiffs are *subjects* of the government's surveillance and data collection pursuant to the AG Policy.  In short, the hardship factor weighs in favor of finding the case ripe for review.  As demonstrated previously, the challenged policy directive is causing a present injury to Plaintiffs, whose public reputations have been harmed by the government's designation of them as criminal "threats" and "domestic terrorists."  The harm to Plaintiffs will persist without judicial relief.

This case is also fit for judicial review. "In considering the fitness of an issue for judicial review, the court must ensure that a record adequate to support an informed decision exists when the case is heard." *Nat'l Rifle Assoc. of Am.*, 132 F.3d at 290. A case that largely presents a legal issue, such as the challenge at issue here, is fit for judicial resolution. *See Thomas*, 473 U.S. at 581 (holding the matter was ripe where the issue presented was "purely legal, and will not be clarified by further factual development"); *Abbot Labs.*, 387 U.S. at 149 (same); *Nat'l Rifle Assoc. of Am.*, 132 F.3d at 290-91 (same). The ultimate issue of whether it is lawful for the AG to designate Plaintiffs as criminal "threats" and "domestic terrorists" engaging in objectionable speech, thereby subjecting Plaintiffs to federal investigation and surveillance, all of which will be maintained in an official government database, is ultimately a legal issue for the Court to decide. *See Presbyterian Church*, 870 F.2d at 522-23 ("A judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could freely participate in the services without having their religious expression being recorded by the government and becoming part of official records.").

Furthermore, when the government chills a citizen's First Amendment rights, the case is ripe and the citizen need not wait for some adverse consequence before challenging the action. As noted by the Supreme Court, "[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Dombrowski*, 380 U.S. at 486 ("Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights."). Indeed, the standing and ripeness requirements are appropriately relaxed in this case because it arises under the First Amendment. *See Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002)

(noting that the ripeness requirements are relaxed in the First Amendment context); *Cheffer v. Reno*, 55 F.3d 1517, 1523 n.12 (11th Cir. 1995) (same); *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1033 n.18 (5th Cir. 1981) (noting that the injury-in-fact requirement for standing is properly relaxed for First Amendment challenges); *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) (same); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996) ("[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences."); *Minn. Citizens Concerned for Life v. Fed. Election Comm'n.*, 113 F.3d 129, 132 (8th Cir. 1997) ("Sufficient hardship is usually found if the regulation . . . chills protected First Amendment activity.").

At the end of the day, Plaintiffs are powerless against the AG and the government resources he wields.  Plaintiffs' only recourse against the AG is to seek judicial relief in a court of law.  The hardship is real, and this case is fit for judicial resolution.  The case is ripe for review.

**D.     Plaintiffs' Claims Are Redressable: Declaratory and Injunctive Relief Are Appropriate.**

Prospective relief is appropriate and would redress the harm alleged for the reason stated by the Ninth Circuit in *Presbyterian Church*: "A judicial determination that the INS surveillance of the churches' religious services violated the First Amendment would reassure members that they could freely participate in the services without having their religious expression being recorded by the government and becoming part of official records."  *Presbyterian Church*, 870 F.2d at 523.

And the requested relief is certainly appropriate and would redress the harm alleged for the reasons stated by the Sixth Circuit in *Parsons v. United States DOJ*, 801 F.3d 701 (6th Cir. 2015):

> The Agencies argue that the alleged reputational harm and chilling effect would not be remedied by an order setting aside the 2011 [National Gang Intelligence Center or] NGIC Report because information about criminal activity performed by Juggalo

subsets is available from a variety of other sources, including state and local law enforcement in the locations where the Juggalos were allegedly injured. . . .  In *Meese*, the defendant, the Attorney General, espoused an analogous argument— that enjoinment of the DOJ's label of certain films as "political propaganda" would not stem negative reaction to the plaintiff's exhibition of the films. . . .  The Supreme Court disagreed, articulating that the harm to plaintiff occurred because "*the Department of Justice has placed the legitimate force of its criminal enforcement powers behind the label of 'political propaganda.'*" . . .  The Juggalos in this case *also suffer alleged harm due to the force of a DOJ informational label*.  While the 2011 NGIC Report *is not the designation itself, it reflects the designation* and includes an analytical component of the criminal activity performed by Juggalo subsets, classifying the activity as gang-like.  As in *Meese*, "[a] *judgment declaring the* [action in *question*] *unconstitutional would eliminate the need to choose between* [First Amendment-protected activity] *and incurring the risk that public perception of this criminal enforcement scheme will harm appellee's reputation*."

The Agencies also assert that an order declaring the 2011 NGIC Report unconstitutional would not alleviate the alleged harm entirely because the information on Juggalo activity is available through the aforementioned alternate channels.  But it need not be likely that the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement.  *See Meese*, 481 U.S. at 476 ("enjoining the application of the words 'political propaganda' to the films would at least partially redress the reputational injury of which appellee complains"); [*Friends of the Earth, Inc. v.*] *Laidlaw* [*Envtl. Servs., Inc.*, 528 U.S. 167, 185 (2000)] (finding civil penalties sufficient to satisfy redressability noting that they have at least "*some* deterrent effect") (emphasis added).  "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of a suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."  *Laidlaw*, 528 U.S. at 185-86.  An order declaring the 2011 NGIC Report unconstitutional and setting it aside would abate the reflection of Juggalo criminal activity as gang or gang-like by the Agencies. . . .  *The declaration the Juggalos seek would likely combat at least some future risk that they would be subjected to reputational harm and chill due to the force of the DOJ's criminal gang or gang-like designation*.

*Parsons*, 801 F.3d at 716-17 (internal citations omitted) (emphasis added).

A judicial determination that the AG Policy violates federal law would reassure Plaintiffs and those who associate with them that they could freely participate in their constitutionally protected activities without being denigrated and labeled as a criminal "threat" or "domestic terrorist" by the government, appearing in government records as a "threat" or "domestic terrorist," or being threatened by the government with investigation because of their speech and the message

it conveys.  Furthermore, the requested relief will help repair Plaintiffs' public reputation—a reputation that the AG seeks to tarnish through his policy directive.

Accordingly, the Court could redress the harm by granting judgment in Plaintiffs' favor and declaring, at a minimum, that the AG Policy violates Plaintiffs' constitutional and statutory rights and that threatening investigations, surveillance, and official record keeping of Plaintiffs because of their speech violates Plaintiffs' rights, as set forth above.  The Court could enter an order enjoining the AG from making such false and harmful public statements about Plaintiffs. *See, e.g., Rooks v. Krzewski*, No. 306034, 2014 Mich. App. LEXIS 604, at *91 (Mich. Ct. App. Apr. 3, 2014) ("Numerous other courts, both federal and state, have held that a trial court may enjoin a defendant from making defamatory statements after there has been a determination that the speech was, in fact, false.") (citing cases).  And the Court could issue an order expunging all official government records that list, endorse, affirm, infer, or include Plaintiffs because of their speech activity.  *See Smith v. Nixon*, 807 F.2d 197, 204 (D.C. Cir. 1986) (stating that "a court may order expungement of records in an action brought . . . directly under the Constitution, without violating the intricate statutory provisions that purport to be the 'exclusive' means by which [government records] may . . . be alienated or destroyed"), which includes, at a minimum, the records identified in the First Amended Complaint.

In sum, "[a] judgment declaring the [action in question] unconstitutional would eliminate the need to choose between [First Amendment-protected activity] and incurring ***the risk that public perception*** of this criminal enforcement scheme will harm [Plaintiffs'] reputation."  *See Parsons*, 801 F.3d at 717 (emphasis added).  The declaration Plaintiffs "seek would likely combat at least some future risk that they would be subjected to reputational harm and chill due to the force of [the AG's] designation."  *Id*.

## CONCLUSION

What Justice Douglas stated in his concurrence in *Gibson v. Florida Legislative Committee*, 372 U.S. 539, 570 (1963), rings true here:

> For the views a citizen entertains, the beliefs he harbors, the utterances he makes, the ideology he embraces and the people he associates with are no concern of government.  That article of faith marks indeed the main difference between the Free Society which we espouse and the dictatorships both on the Left and on the Right.

Due in large part to the watchful eye of the judiciary, the government has not been allowed to abridge—whether directly, indirectly, forcefully, or subtly—the precious and vulnerable First Amendment freedoms of law-abiding citizens, regardless of political ideology.  A private citizen's first defense against such government abuse is the Constitution.  Consequently, the challenged policy at issue here, which takes us a step closer to the "dictatorship . . . on the Left," cannot exist in the Free Society described by Justice Douglas.

Plaintiffs respectfully requests that the Court deny the AG's motion to dismiss.

Respectfully submitted,

**AMERICAN FREEDOM LAW CENTER**

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (D.C. Court Bar No. MI 0052)
P.O. Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
rmuise@americanfreedomlawcenter.org

/s/ *David Yerushalmi*
David Yerushalmi, Esq. (DC Bar No. 978179)
2020 Pennsylvania Avenue NW, Suite 189
Washington, D.C. 20001
dyerushalmi@americanfreedomlawcenter.org
(646) 262-0500

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the court's electronic filing system. Parties may access this filing through the court's system. I further certify that a copy of the foregoing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq.